Certiorari Granted, No. 31,732, July 1, 2009

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: 2009-NMCA-064

Filing Date:   May 7, 2009

Docket No. 27,338

**STATE OF NEW MEXICO,**

  **Plaintiff-Appellee,**

v.

**CHRISTOPHER SMILE,**

  **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF OTERO COUNTY**
**Jerry H. Ritter, Jr., District Judge**

Gary K. King, Attorney General
Santa Fe, NM

James W. Grayson, Assistant Attorney General
Albuquerque, NM

for Appellee

Hugh W. Dangler, Chief Public Defender
Mary A. Barket, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**OPINION**

**FRY, Chief Judge.**

**{1}**     Defendant appeals from his conviction for aggravated stalking in violation of NMSA 1978, Section 30-3A-3.1 (1997).  Defendant argues that his conduct was insufficient to support a charge of aggravated stalking, that testimony regarding statements he made to the

1

police prior to and after his arrest should have been suppressed because he was not read his *Miranda* rights, and that the trial court erroneously admitted evidence that Defendant had attempted to plead guilty at his first appearance. For the following reasons, we affirm Defendant's conviction.

## I. BACKGROUND

{2} Defendant and Tamisha, the victim of Defendant's stalking, met online. After having regular telephone conversations over a period of time, Defendant traveled from Little Rock, Arkansas, to Alamogordo, New Mexico, to meet Tamisha in person. After initially staying in a motel room that Tamisha had rented, Defendant stayed for a few weeks at an apartment being rented by Tamisha's friend Samantha. Although the relationship between Tamisha and Defendant was initially friendly, about three weeks after Defendant had arrived in Alamogordo, Tamisha became concerned that Defendant was more serious about the relationship than she was. Tamisha decided that Defendant needed to move out of Samantha's apartment, so she packed up Defendant's belongings and left them with one of Defendant's co-workers.

{3} Later that evening, Defendant showed up at Samantha's apartment looking for Tamisha. Samantha told Defendant that Tamisha was not there and, according to the girls' testimony, Defendant pretended to leave. As soon as Tamisha started to talk, however, Defendant began yelling from outside that he knew she was in there and started pounding on the door because, according to his testimony, he was enraged that Samantha had lied to him and that Tamisha was hiding from him. After cursing and shouting for Tamisha to come out of the apartment to no avail, Defendant threatened to damage Tamisha's and Samantha's cars that were parked in front of the apartment. The girls immediately called the police and ran outside to ensure that their vehicles were not damaged.

{4} Following this incident, Tamisha and Defendant reconciled for a short time. However, the relationship deteriorated quickly after Tamisha went on a weekend trip with some of her friends. Defendant testified that while Tamisha was gone, he had a vision while staring at a blank television screen in which he saw Tamisha being intimate with another man. When Tamisha returned to Alamogordo, Defendant went to Tamisha's apartment and accused her of cheating on him while she was out of town. Tamisha told Defendant that they were just friends and that she had in fact been with someone else over the weekend. Defendant became enraged by this comment and started to move toward Tamisha and her friend Hope in a threatening manner. In addition, Defendant stated, "[if] I see [you and your new boyfriend] together, I'm killing both of you." Fearing for their safety, Tamisha and Hope pushed Defendant out of the apartment and called the police. By the time the police arrived, Defendant had left the scene. The responding officer advised Tamisha that the best way to stop Defendant from threatening her was to obtain a temporary restraining order (TRO). Because of the threats Defendant had made to kill her and her new boyfriend, the threat he had made to damage her car after she took his belongings to his workplace, and because Defendant had left a number of threatening letters in Tamisha's mailbox and had

2

made a threatening phone call to Tamisha's father, Tamisha obtained a TRO the following day.

**{5}**     On the day Tamisha obtained the TRO, but before Defendant was served, Tamisha pulled into the parking lot of her apartment complex and saw Defendant sitting in a chair holding "Ninja-style" knives that he had recently purchased. Fearing for her safety, Tamisha quickly backed out of the parking lot, called 911, and circled the block until the police arrived. When the police arrived and began talking to Defendant, Defendant stated that he was there to "put the fear of God" into Tamisha for what she had done to him and that he could accomplish this in three ways: by letting it go, by calling his "homies" from Arkansas to help him out, or by taking care of it himself using the Ninja skills he had studied in Japan and intimidation methods he had learned as an ex-felon. While Defendant was talking to Officer Guinn, the officer who had responded to Tamisha's 911 call, another officer arrived and served Defendant with the TRO Tamisha had obtained earlier in the day. Officer Guinn explained the seriousness of the TRO to Defendant, and Defendant acknowledged that he understood the consequences that would arise from a violation of the order. Before Officer Guinn took Defendant back to his residence, however, Defendant stated that a piece of paper was not going to stop him from inflicting pain and fear on Tamisha.

**{6}**     Following this incident, Tamisha, who worked a night shift, went to work. When she returned home the next morning, she found a copy of the TRO in her door with a handwritten message stating, "It ain't over, [b]itch, I want to see your man[;] [w]here he at?" Tamisha recognized the handwriting as Defendant's, immediately became concerned for her safety, and called the police. Officer Jackson responded to the call and began investigating the TRO violation. Officer Jackson later met with Officer Guinn, and the two officers went to Defendant's residence to determine if he had written the threatening message on the TRO. After a brief investigation, Defendant was arrested for violating the TRO. After his arrest, however, the officers determined that Defendant had violated Section 30-3A-3.1, and the State charged Defendant with aggravated stalking due to the pattern of threatening behavior he had engaged in and his threatening conduct in violation of the TRO.

## II.     DISCUSSION

### A.     The Aggravated Stalking Statute

**{7}**     At trial, after the State rested its case, Defendant argued that the State had presented insufficient evidence to support a conviction for aggravated stalking because he had engaged in only one instance of threatening conduct after he was served with the TRO, and Section 30-3A-3.1 requires that there be a pattern of conduct *after* the TRO is served. The trial court disagreed and concluded that Section 30-3A-3.1 requires only one threatening act following the issuance of a TRO. On appeal, Defendant makes the same argument that he made in the trial court.

### 1.     Standard of Review

3

**{8}** Interpretation of a statute is a question of law that we review de novo. *State v. Davis*, 2007-NMCA-022, ¶ 6, 141 N.M. 205, 152 P.3d 848. "Our ultimate goal in statutory construction is to ascertain and give effect to the intent of the Legislature." *State v. Smith*, 2004-NMSC-032, ¶ 8, 136 N.M. 372, 98 P.3d 1022 (internal quotation marks and citation omitted). To reach this goal, we begin "by looking first to the words chosen by the Legislature and the plain meaning of the Legislature's language." *State v. Davis*, 2003-NMSC-022, ¶ 6, 134 N.M. 172, 74 P.3d 1064 (internal quotation marks and citation omitted). "When a statute contains language which is clear and unambiguous, we must give effect to that language and refrain from further statutory interpretation." *State v. Johnson*, 2001-NMSC-001, ¶ 6, 130 N.M. 6, 15 P.3d 1233 (internal quotation marks and citation omitted).

**2.     The Aggravated Stalking Statute Requires Only One Act in Furtherance of a Pattern of Stalking**

**{9}** Defendant was charged with and convicted of aggravated stalking, a fourth degree felony, pursuant to the Harassment and Stalking Act (the Act). NMSA 1978, §§ 30-3A-1 to -4 (1997).

> A.     Aggravated stalking consists of stalking perpetrated by a person:
>
> (1)     who knowingly violates a permanent or temporary order of protection issued by a court, except that mutual violations of such orders may constitute a defense to aggravated stalking;
>
> (2)     in violation of a court order setting conditions of release and bond;
>
> (3)     when the person is in possession of a deadly weapon; or
>
> (4)     when the victim is less than sixteen years of age.

§ 30-3A-3.1(A)(1)-(4). Stalking is defined as

> knowingly pursuing a pattern of conduct that would cause a reasonable person to feel frightened, intimidated or threatened. The alleged stalker must intend to place another person in reasonable apprehension of death, bodily harm, sexual assault, confinement or restraint or the alleged stalker must intend to cause a reasonable person to fear for his safety or the safety of a household member. In furtherance of the stalking, the alleged stalker must commit one or more of the following acts on more than one occasion:

4

(1)    following another person, in a place other than the residence of the alleged stalker;

(2)    placing another person under surveillance by being present outside that person's residence, school, workplace or motor vehicle or any other place frequented by that person, other than the residence of the alleged stalker; or

(3)    harassing another person.

§ 30-3A-3(A)(1)-(3). Defendant's aggravated stalking conviction was based on his violation of Section 30-3A-3.1(A)(1), stalking perpetrated by a person who knowingly violates a temporary order of protection.

**{10}**    Our Legislature first enacted the Act in 1993. 1993 N.M. Laws, ch. 86, § 2. The 1993 Act criminalized stalking but made the crime a misdemeanor. *Id.* It was only when an offender was convicted of a third stalking offense that the crime escalated to a fourth degree felony. 1993 N.M. Laws, ch. 86, § 3(C). In 1997, the Legislature repealed the 1993 Act and enacted the current Act. 1997 N.M. Laws, ch. 10. The new Act made a second and subsequent conviction a fourth degree felony and created the new crime of aggravated stalking, also a fourth degree felony. § 30-3A-3(C). Thus, the modifications imposed a harsher punishment upon those offenders who posed a significant danger to their victims because of repeat offenses, the age of the victim, the presence of a deadly weapon, or the offender's disregard of a court order or a court sanction. *See* § 30-3A-3.1. By changing the penalty for an offender's second conviction from a misdemeanor to a felony, for example, the Legislature ensured that an individual who has already been convicted of stalking receives a harsher punishment when he or she ignores the sanctions imposed by the first offense and continues to stalk a victim. Similarly, the Legislature imposed a harsher penalty when a stalker violates a TRO or a court order because a stalker who ignores such an order ostensibly poses a more serious threat to his or her victim. Having already been warned that his or her conduct is prohibited, an individual who continues to stalk disregards the rule of law and poses a significant threat to the safety of his or her victim.

**{11}**    Despite the Legislature's intent to provide greater protection to stalking victims who have obtained a TRO, Defendant argues that the plain language of the statute requires the State to prove that there was a pattern of threatening conduct *after* the TRO was served. Under Defendant's interpretation of the statute, an individual would be charged with misdemeanor stalking for any threatening conduct that occurred prior to the issuance of a TRO and could only be charged with aggravated stalking if a *new* pattern of conduct occurred *after* the TRO has been issued. In support of this contention, Defendant argues that because there is a separate offense for a single violation of a protective order, *see* NMSA 1978, § 40-13-6(F) (2008) (establishing that a single violation of a protective order is a misdemeanor offense), the Legislature must have intended that there be multiple violations of a protective order before an aggravated stalking charge can be brought.

5

**{12}**     We are not persuaded.  As the State points out, it is possible to violate a restraining order in a manner that would not satisfy the requirements of the stalking statute.  If, for example, Defendant had violated the TRO by telephoning Tamisha in a non-threatening manner, he could have been charged with violating the restraining order but not with stalking because the definition of stalking requires behavior that causes a reasonable person to feel frightened, intimidated, or threatened, and the stalker must intend to make the victim fear for his or her safety or the safety of a family member.  § 30-3A-3.  Where, as here, the violation of the restraining order is done in a threatening manner, is intended to place the victim in fear, and is a part of an established pattern of stalking behavior, then aggravated stalking charges may be proper.

**{13}**     In addition, under Defendant's interpretation of the aggravated stalking statute, an individual who engages in a pattern of threatening behavior and then is restrained by a TRO could only be charged with misdemeanor stalking for the pattern of conduct that occurred prior to the TRO, a misdemeanor violation of the TRO for the first, second, and possibly third violations of the TRO, and then, only if the TRO violations occurred with enough frequency to be considered a pattern, a charge of aggravated stalking could be brought.  As the State points out, this interpretation would create an arbitrary break in an otherwise continuous pattern of threatening behavior and would frustrate the legislative purpose of providing greater protection to victims who obtain TROs against their stalkers.  Nothing in Section 30-3A-3.1 supports Defendant's interpretation.

**{14}**     When the statute is considered as a whole and Defendant's interpretation is applied to the other aggravating factors, the incongruity of Defendant's argument becomes apparent.  The third aggravating factor in the statute is "stalking perpetrated by a person . . . when the person is in possession of a deadly weapon."  § 30-3A-3.1.  We have interpreted this to require not only that the stalker be in possession of a deadly weapon, but also that the stalker intended to use the deadly weapon.  *See State v. Anderson*, 2001-NMCA-027, ¶ 32, 130 N.M. 295, 24 P.3d 327.  Under Defendant's interpretation of the statute, an individual could not be charged with aggravated stalking unless he or she engaged in stalking behavior while carrying a deadly weapon with the intent to use it against the victim on a sufficient number of occasions to establish a pattern of conduct.  The Legislature could not have intended to allow a stalker to repeatedly subject a victim to such unreasonable risk.  Thus, while a pattern of conduct is required to establish that stalking has occurred, the crime charged may be escalated to aggravated stalking as soon as one of the aggravating factors occurs.

**{15}**     The out-of-state authority cited by Defendant does not persuade us to reach a different conclusion.  *Vazquez v. State*, 953 So. 2d 569 (Fla. Dist. Ct. App. 2007), is inapplicable to our analysis because the plain language of Florida's aggravated stalking statute requires that an offender *repeatedly* engage in conduct in violation of a court order.  Fla. Stat. Ann. § 784.048(4) (West 2008) (providing harsher punishment for any person who, "after an injunction for protection . . . *repeatedly* follows, harasses, or cyberstalks another person" (emphasis added)).  In the California case Defendant cites, *People v. McClelland*, 49 Cal. Rptr. 2d 587, 590-91 (Ct. App. 1996), the defendant had made numerous threats to

6

his victim after being served with a TRO, and the court therefore did not address the issue before us today. Thus, *McClelland* provides no guidance in our resolution of this case. *See Fernandez v. Farmers Ins. Co.*, 115 N.M. 622, 627, 857 P.2d 22, 27 (1993) (noting that cases are not authority for propositions not considered).

{16}    It is undisputed that Defendant engaged in a pattern of harassing conduct sufficient to charge him with stalking and that Defendant made an additional threat to Tamisha after being served with a TRO that specifically prohibited the conduct in which he had been engaging. We, therefore, affirm the trial court's determination that the Act applied to Defendant's conduct. Because of our holding, we do not address Defendant's argument that under his interpretation of the statute there was insufficient conduct following the issuance of the restraining order to support his conviction.

## 3.    The Aggravated Stalking Statute is Not Unconstitutionally Vague

{17}    Defendant next argues that our interpretation of the aggravated stalking statute renders the statute unconstitutionally vague. We review a vagueness challenge de novo "in light of the facts of the case and the conduct which is prohibited by the statute." *State v. Duran*, 1998-NMCA-153, ¶ 31, 126 N.M. 60, 966 P.2d 768. Defendant "[can]not succeed if the statute clearly applied to his conduct" and, because there is a strong presumption of constitutionality underlying each legislative enactment, Defendant "has the burden of proving [the] statute is unconstitutional beyond all reasonable doubt." *State v. Laguna*, 1999-NMCA-152, ¶ 24, 128 N.M. 345, 992 P.2d 896 (citation omitted).

{18}    There are two ways in which Defendant can meet this burden. He can either demonstrate that the statute fails to "allow[] individuals of ordinary intelligence a fair opportunity to determine whether their conduct is prohibited," or he can demonstrate that the "statute permits police officers, prosecutors, judges, or juries to engage in arbitrary and discriminatory enforcement of the statute, which occurs because the statute has no standards or guidelines and therefore allows, if not encourages, subjective and *ad hoc* application." *Id.* ¶¶ 25-26. Defendant argues that our interpretation of the statute is unconstitutional under both prongs of the vagueness test.

{19}    Defendant first argues that because the majority of his actions constituting a pattern of stalking conduct occurred prior to the issuance of the TRO, he was not on notice that his actions might constitute an offense as serious as a felony. Defendant's argument is without merit. A person of ordinary intelligence reading the Act can easily understand that engaging in a pattern of threatening conduct may result in a charge of misdemeanor stalking under Section 30-3A-3. Such a person reading Section 30-3A-3.1 would further understand that continuing such conduct after being ordered by a court to stay away from the victim may result in a charge of aggravated stalking and increased criminal penalties.

{20}    Defendant next argues that the aggravated stalking statute is unconstitutionally vague because it can be applied in an ad hoc, abitrary manner. That the State had some discretion

7

to charge Defendant with the felony crime he committed or a lesser offense such as misdemeanor stalking or a mere violation of the restraining order does not render the statute unconstitutionally vague. In order to fall within the arbitrary and discriminatory prong of the vagueness test, the statute must have "no standards or guidelines and therefore allow[], if not encourage[], subjective and *ad hoc* application." *Laguna*, 1999-NMCA-152, ¶ 26. In *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971), for example, the United States Supreme Court held that a statute was unconstitutionally vague because it criminalized conduct that "annoyed" police officers or passers-by in Cincinnati. The Court held that not only did this statute fail to put individuals on notice of what conduct would annoy a police officer, but it also gave the police arbitrary discretion to charge an individual with a violation of the statute using a vague and subjective standard. *See id.*

**{21}** Unlike the arbitrary discretion given to police officers and prosecutors condemned in *Coates*, the aggravated stalking statute has clear guidelines regarding what circumstances will escalate the misdemeanor crime to a felony offense. The prosecutor's decision to charge Defendant with aggravated stalking did not require any arbitrary discretion. Instead, the prosecutor applied the law as stated in the Act to the conduct of Defendant and determined that Defendant had engaged in a pattern of threatening behavior directed at Tamisha, had continued that threatening conduct after being ordered by the court to stop, and had, therefore, committed aggravated stalking.

## B.     Alleged *Miranda* Violations

**{22}** Defendant next argues that certain statements he made to the police should have been suppressed because he was not given *Miranda* warnings before he made the statements. On the night that Defendant was arrested, Officer Guinn and Officer Jackson went to look for Defendant at his apartment but were unable to locate him. Because they also needed to issue a citation to one of Defendant's roommates for marijuana possession, however, the two officers remained in the area for about an hour discussing the situation, issuing the citations, and filling out evidence receipts. The two police vehicles were parked on the street about fifty yards from Defendant's apartment. While the officers were parked, Defendant arrived in a vehicle and stopped. Defendant got out of that vehicle, walked the fifty yards to the police officers, and yelled out that he understood that they were looking for him. The officers began to talk with Defendant about the reason they were looking for him, and Defendant made a number of incriminating statements regarding the TRO violation and the threats he had made to Tamisha. Defendant made an additional incriminating statement after his arrest while he was being booked. It is undisputed that Defendant was not read his *Miranda* rights at any time during his encounters with the officers.

**{23}** *Miranda* warnings are intended to prevent situations where "the circumstances surrounding the asking of a question by law enforcement are so inherently coercive that any answer" given by a defendant is deemed to be compelled and not the result of the defendant's free will. *State v. Javier M.*, 2001-NMSC-030, ¶ 14, 131 N.M. 1, 33 P.3d 1. "The standard of review for suppression rulings is whether the law was correctly applied to

8

the facts, viewing them in a manner most favorable to the prevailing party." *State v. Harbison*, 2007-NMSC-016, ¶ 8, 141 N.M. 392, 156 P.3d 30 (internal quotation marks and citation omitted). While we apply a deferential standard to the trial court's findings of fact, *see State v. Lopez*, 2005-NMSC-018, ¶ 9, 138 N.M. 9, 116 P.3d 80, "[d]etermining whether or not a police interview constitutes a custodial interrogation requires the application of law to the facts," and we, therefore, apply de novo review of the trial court's ruling. *State v. Nieto*, 2000-NMSC-031, ¶ 19, 129 N.M. 688, 12 P.3d 442.

**{24}** The suppression of an incriminating statement made by a defendant to a police officer "is only required when the statements are the product of a custodial interrogation." *State v. Fekete*, 120 N.M. 290, 300, 901 P.2d 708, 718 (1995). Thus, two separate circumstances must exist before *Miranda* warnings are required—the defendant must be in custody and there must be an interrogation.

**{25}** Defendant sought to suppress statements he made on two separate occasions, each requiring us to analyze different elements of the custodial interrogation requirement. The first set of statements Defendant sought to suppress was made before he was arrested and clearly involved interrogation, but the trial court determined that Defendant was not in custody. The second statement was made after Defendant's arrest while he was clearly in custody, but the trial court held that Defendant's statement was not made in response to an interrogation. Because of the distinct factual differences between the two sets of statements Defendant made, we address them separately.

### 1. Pre-Arrest Statements

**{26}** There is no dispute that Officers Guinn and Jackson questioned Defendant outside of his apartment prior to his arrest. Thus, our inquiry focuses solely on whether Defendant was in custody such that *Miranda* warnings were required prior to his questioning. Whether or not an individual is in custody depends on "how a reasonable man in the suspect's position would have understood his situation," *Fekete*, 120 N.M. at 300, 901 P.2d at 718 (internal quotation marks and citation omitted), and not on the "subjective perception of any of the members to the interview." *Nieto*, 2000-NMSC-031, ¶ 20. An interview is custodial and, therefore, subject to mandatory *Miranda* warnings if there is a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Id.* (internal quotation marks and citations omitted). However, the questioning of an individual during an investigatory detention instigated by an officer's reasonable belief that the individual has engaged in criminal activity is generally not considered a custodial interrogation subject to *Miranda* requirements. *Javier M.*, 2001-NMSC-030, ¶19. *But see State v. Wilson*, 2007-NMCA-111, ¶¶ 18, 19, 142 N.M. 737, 169 P.3d 1184 (noting that in some situations, such as when an officer uses handcuffs, puts the suspect in a police vehicle, or uses force, an investigatory detention can become the equivalent of custody such that the *Miranda* warnings are required). In addition, the fact that an officer has focused his investigation on the defendant at the time of questioning does not necessitate *Miranda* warnings. *State v. Swise*, 100 N.M. 256, 258, 669 P.2d 732, 734 (1983).

9

**{27}** Determining whether an individual is in custody for purposes of *Miranda* requires a fact-specific analysis of the circumstances in which the questioning took place. In *State v. Munoz*, for example, our Supreme Court held that a suspect was not in custody where he was questioned for approximately one hour and forty minutes by FBI agents in the back of an FBI vehicle parked a mile or so from the suspect's house. 1998-NMSC-048, ¶¶ 39, 42-43, 126 N.M. 535, 972 P.2d 847. The individual was a prime suspect in a murder investigation and the agents had picked him up at his home and transported him to the location where he was questioned and ultimately confessed to stabbing his victim multiple times in the neck. *Id.* ¶¶ 3-6, 11. Despite the length and location of the questioning, the Court explained that there was no evidence that the suspect's freedom had been restrained in any way that could be associated with a formal arrest. *Id.* ¶ 43. He had voluntarily accompanied the agents after being told that he did not have to go with them, he was not handcuffed or searched, the car doors were not locked during the questioning, and the car was parked along a busy street during daylight. *Id.* ¶¶ 43-44.

**{28}** In contrast, this Court held that a suspect *was* in custody despite not being formally under arrest where a police officer ordered the suspect out of his vehicle, forcibly placed handcuffs on him in a manner that caused him to drop to his knees, and then questioned the suspect in the back of the officer's vehicle. *Wilson*, 2007-NMCA-111, ¶ 35. We noted that a reasonable person in the suspect's position would have believed "that he was restrained to the degree associated with a formal arrest." *Id.*

**{29}** In the present case, we cannot conclude that a reasonable person in Defendant's position would have believed that he was subject to the degree of restraint associated with a formal arrest. While Officers Guinn and Jackson were parked on the street in front of Defendant's apartment, Defendant pulled up in a vehicle and, without any provocation, got out of the vehicle and voluntarily walked at least fifty yards to the location of the officers. He then called out that he heard they were looking for him and approached the officers. Because of Officer Guinn's knowledge that Defendant carried Ninja knives, he frisked Defendant for safety purposes, but Defendant was not restrained in any manner. Defendant stayed a "safe distance" away from the officers at all times, and the officers questioned him for approximately twenty minutes.

**{30}** The circumstances of Defendant's questioning are similar to but far less "custodial" than the facts our Supreme Court found did not constitute custody in *Munoz*. In addition, unlike the defendant in *Wilson*, who was forcibly handcuffed and interrogated in the back of police cruiser, the officers did not use any force on Defendant nor did they handcuff him during the questioning. Thus, we conclude that a reasonable person in Defendant's position would not have believed that he was in custody.

**{31}** Defendant contends that because he had been warned the night before that he would be arrested if he violated the TRO, he knew that his arrest was imminent and was therefore in custody when the officers began to question him about the TRO violation. Thus, Defendant argues that because he broke the law and because the officers questioned him

about that violation, he was in custody for purposes of a *Miranda* analysis. This argument is without merit. We do not consider the subjective beliefs of the parties to the interview. *Nieto*, 2000-NMSC-031, ¶ 20. Thus, any belief that Defendant may have had regarding whether he would be arrested does not affect our conclusion that Defendant was not in custody and that *Miranda* warnings were not required.

## 2.    Post-Arrest Statement

**{32}**    Following his arrest, Defendant was transported to the police station for booking. During booking, Defendant became extremely upset and agitated and started cursing about Tamisha and what she had done to him. Officer Jackson told Defendant, "You need to calm down, you need to forget about her, you need to let her go." In response to this statement, Defendant told Officer Jackson, "You're right, I should just let her go . . . because if I stick around, the next time you'll be fingerprinting me, it'll be for murder." Because Defendant was being booked into jail at the time he made this statement, there is no dispute that he was in custody. However, because Officer Jackson did not ask Defendant a question, the parties disagree as to whether Defendant was being interrogated at the time that he made the statement.

**{33}**    Because the primary purpose of *Miranda* warnings is to prevent the introduction of compelled, involuntary incriminating statements, interrogation "must reflect a measure of compulsion above and beyond that inherent in custody itself," and a statement given freely and voluntarily without any compelling influences does not violate *Miranda*. *Rhode Island v. Innis*, 446 U.S. 291, 299-300 (1980). An "[i]nterrogation occurs when an officer subjects an individual to questioning or circumstances which the officer knows or should know are reasonably likely to elicit incriminating responses." *Fekete*, 120 N.M. at 300, 901 P.2d at 718 (internal quotation marks and citation omitted). *Miranda* does not apply "in those situations where [a defendant] volunteers statements" either by making a statement "which the police did not attempt to elicit" or by making a statement that is "unresponsive to the questions asked." *Id.*

**{34}**    Defendant argues that Officer Jackson knew that Defendant would make an incriminating statement when he told Defendant to forget about Tamisha because Officer Jackson had told Defendant the same thing prior to the arrest and Defendant had made similar incriminating statements. Thus, Defendant argues that "Officer Jackson was aware that almost any statement to [Defendant] about his relationship with [Tamisha] would elicit a veritable wave of incriminating information."

**{35}**    We assume, without deciding, that because Defendant had previously made incriminating statements when he was told to forget about Tamisha, Officer Jackson should have known that telling Defendant to calm down would elicit an incriminating response. Under this assumption, the trial court erred in allowing the testimony regarding Defendant's statement that he would be fingerprinted for murder if he did not forget about Tamisha. However, based on the evidence presented at trial, this error was harmless. "An error is

11

harmless if the [s]tate can establish . . . beyond a reasonable doubt" that there is no reasonable possibility that the objectionable evidence might have contributed to the defendant's conviction. *State v. Walters*, 2007-NMSC-050, ¶ 25, 142 N.M. 644, 168 P.3d 1068 (internal quotation marks and citations omitted). In determining whether the state has met this burden, we examine several factors including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and . . . the overall strength of the prosecution's case." *Id.* ¶ 26 (internal quotation marks and citation omitted).

{36}    Prior to the testimony regarding Defendant's statement that he would be fingerprinted for murder, a substantial amount of incriminating evidence had already been presented. Tamisha and her friends testified that Defendant had threatened Tamisha and her new boyfriend and that he had engaged in a pattern of threatening conduct directed at Tamisha. Officer Guinn testified that Defendant had said he would make Tamisha feel his pain and that he was armed with Ninja-style knives and had trained extensively in Japan as a Ninja. Officer Jackson testified that Defendant had threatened that he could "take care" of Tamisha by calling his homies or by taking care of her himself using his Ninja training. In addition, Defendant himself admitted to all of the essential elements of aggravated stalking. He did not dispute that he had engaged in a pattern of threatening conduct prior to the issuance of the TRO, nor did he dispute that he wrote a threatening message on his copy of the TRO and then placed it in Tamisha's door. Instead, Defendant merely argued that all of his threats were empty and that he never intended to follow through with any of them. Thus, Defendant's statement that he would be booked for murder was merely a cumulative statement that repeated his earlier undisputed threats to harm Tamisha. *See Fekete*, 120 N.M. at 301, 901 P.2d at 719 (noting that even if an officer's question was an interrogation, the statements made by the defendant merely repeated what he had stated earlier and their admission was therefore harmless error).

{37}    We, therefore, cannot conclude that Defendant's statement influenced the jury's decision to convict Defendant for aggravated stalking. All of the evidence supporting Defendant's conviction was uncontested and had already been established before the statement was erroneously admitted. Defendant was charged and convicted of aggravated stalking, not attempted murder, and he never disputed that he made the threats that formed the basis of his conviction. Thus, we hold that even if the admission of Defendant's post-arrest statement was error, the error was harmless.

C.    **Rule 11-410 NMRA Bars the Admission of Evidence That a Defendant Pleaded Guilty or Attempted to Plead Guilty but Does Not Require Reversal**

{38}    At his arraignment, Defendant attempted to plead guilty to the charges against him and told the magistrate court that everything Tamisha said about him was true. After Defendant made these statements, the magistrate court informed him that he was being charged with a felony and that the court did not have jurisdiction to accept a guilty plea in

a felony case. At trial, the State called a witness who had been present at Defendant's arraignment and who testified regarding the statements Defendant made when he attempted to plead guilty. Defendant objected to the admission of this evidence on the grounds that it violated his due process rights, that the plea was involuntary, and that such evidence was just generally inadmissible.

**{39}** Defendant now argues that the admission of his attempt to plead guilty violated Rule 11-410, which provides that

> [e]vidence of a plea of guilty or an admission in a children's court proceeding, later withdrawn, or a plea of no contest, or of an offer to plead guilty or no contest to the crime charged or any other crime, or of statements made in connection with any of the foregoing pleas or offers, is not admissible in any civil or criminal proceeding against the person who made the plea or offer.

Because Defendant raises Rule 11-410 for the first time on appeal, the State argues that Defendant failed to adequately preserve the issue. We disagree. Although none of defense counsel's objections specifically referenced Rule 11-410, defense counsel alerted the court on multiple occasions to the general notion that guilty pleas are inadmissible. *See State v. Varela*, 1999-NMSC-045, ¶ 25, 128 N.M. 454, 993 P.2d 1280 (explaining that in order for an issue to be preserved for appeal, the defendant must make a timely objection that specifically apprises the trial court of the nature of the claimed error and invokes an intelligent ruling thereon). We, therefore, address the merits of Defendant's argument. *See State v. Anderson*, 116 N.M. 599, 601, 866 P.2d 327, 329 (1993) (noting that Rule 11-410 issue was preserved for appellate review where defense counsel did not specify the rule in his objection because the trial "court's comments indicate[d] that it was adequately apprised of the application of the rule").

**{40}** Despite the language of Rule 11-410 barring evidence of a guilty plea, the State argues that evidence of Defendant's attempt to plead guilty and the related statements are admissible under our Supreme Court's decision in *Anderson*. There, the Court held that Rule 11-410 applies only if a suspect "relied on the rule in deciding to break silence, because the rule encourages cooperation only if the defendant relied on it." *Anderson*, 116 N.M. at 602-03, 866 P.2d at 330-31. While *Anderson* would seem to suggest that the evidence of Defendant's attempt to plead guilty was admissible since he did not rely on the rule when he made his plea, the State's reliance on this case is misplaced.

**{41}** Rule 11-410 applies to two separate and distinct types of evidence: (1) evidence of a plea of guilty that is later withdrawn and statements made in connection with the plea, and (2) evidence of an offer to plead guilty and statements made in connection with the offer. *Anderson* dealt exclusively with the second type of evidence made inadmissible by Rule 11-410, offers to plead guilty. *Anderson* did not consider the admissibility of an actual guilty plea and statements made in connection with that plea. Here we are concerned only with the

13

first type of guilty plea evidence covered by Rule 11-410, the actual entry of a guilty plea. Thus, *Anderson* does not apply to our analysis of Defendant's appeal.

**{42}** Under Rule 11-410, "[i]f a plea is never entered or entered and then withdrawn, at trial it is to appear as though the earlier plea . . . never took place. The slate is wiped clean once plea negotiations fail or the defendant withdraws his plea." *State v. Trujillo*, 93 N.M. 724, 727, 605 P.2d 232, 235 (1980). When a plea is entered and then withdrawn, Rule 11-410 makes any evidence of that plea inadmissible at trial. *See Standen v. State*, 710 P.2d 718, 720 (Nev. 1985) (noting that a withdrawn guilty plea is "deemed never to have existed and should not be used as evidence"); *Toth v. State*, 297 So. 2d 53, 53 (Fla. Dist. Ct. App. 1974) (holding that a rule similar to Rule 11-410 absolutely bars the admission of evidence that a defendant pleaded guilty and then withdrew the plea). While Defendant did not formally enter and then withdraw his guilty plea, his attempt to enter a guilty plea and the magistrate's rejection of that plea for jurisdictional reasons constituted the functional equivalent of a formal plea entry and withdrawal for purposes of Rule 11-410. Defendant believed that he was formally pleading guilty to the charges against him. Had the court had jurisdiction to accept the plea, Defendant would have had an opportunity to withdraw the plea, thus making Rule 11-410 applicable. Thus, Rule 11-410 barred the admission of evidence that Defendant had attempted to plead guilty, and the trial court erred by admitting the testimony.

**{43}** However, we conclude that the error was harmless. As the dissent points out, evidence of a defendant's attempt to plead guilty is ordinarily inadmissible because, among other reasons, it may compel a defendant to take the stand to explain to the jury why he or she initially pleaded guilty and then later withdrew the plea and decided to challenge the charges at trial. *People v. Spitaleri*, 173 N.E.2d 35, 37 (N.Y. 1961) (noting that evidence of a withdrawn guilty plea "in effect forced [the defendant] to take the stand"). Furthermore, admission of such evidence can be highly prejudicial because "[i]t is also difficult to conceive a disclosure more apt to influence a jury than the information that the accused had at one time [pleaded] guilty to the commission of the crime with which he stands charged." *State v. Boone*, 327 A.2d 661, 666 (N.J. 1974) (internal quotation marks and citation omitted). While we recognize the prejudicial effect that the admission of a defendant's attempt to plead guilty can have on a criminal trial, we disagree with the dissent's contention that "reversible error is committed regardless of what the remaining evidence in the case may be" and that a violation of Rule 11-410 is not subject to a harmless error test.

**{44}** While the dissent correctly notes that the United States Supreme Court did not apply a harmless error test in *Kercheval v. United States*, 274 U.S. 220, 225 (1927), when it ruled that evidence of an attempt to plead guilty is inadmissible, we do not believe that the Court's failure to discuss the sufficiency of the remaining evidence to sustain the conviction indicates that the Court intended to prohibit the use of a harmless error test every time evidence of a guilty plea is improperly admitted. *See Fernandez v. Farmers Ins. Co. of Arizona*, 115 N.M. 622, 627, 857 P.2d 22, 27 (1993) (noting that cases are not authority for propositions not considered). In fact, contrary to the dissent's argument that a harmless error

14

test cannot be applied under these circumstances, a number of other jurisdictions that have considered this issue have applied a harmless error test to the erroneous admission of guilty pleas. *See, e.g, United States v. Acosta-Ballardo*, 8 F.3d 1532, 1536 (10th Cir. 1993) (applying harmless error test to Rule 410 violation and concluding that error was harmless with respect to the defendant's conviction for a charge he admitted to in his testimony but reversible with respect to a charge that required the jury to weigh the credibility of the witnesses); *United States v. Tesack*, 538 F.2d 1068, 1070 (4th Cir. 1976) (holding that due to the strength of the evidence against the defendant, "[i]f there was error in [the admission of the withdrawn guilty plea], we find it entirely harmless"); *Thessen v. State*, 454 P.2d 341, 350 (Alaska 1969) (concluding beyond a reasonable doubt that admission of withdrawn guilty plea did not influence jury), *superseded by statute as stated in State v. Chaney*, 477 P.2d 441 (Alaska 1970); *State v. Thomson*, 278 P.2d 142, 148 (Or. 1954) (en banc) (applying harmless error test to admission of guilty plea evidence and concluding that due to conflicting evidence, reversal was required); *People v. Scheller*, 39 Cal. Rptr. 3d 447, 455 (Ct. App. 2006) (holding that erroneous admission of statements made in reliance on guilty plea was subject to the *Chapman v. California*, 386 U.S. 18 (1967) harmless error test); *State v. Simonson*, 732 P.2d 689, 696 (Idaho Ct. App. 1987) (applying harmless error test to erroneous admission of evidence that the defendant had pleaded guilty and concluding that error was not harmless due to circumstantial nature of the prosecution's case); *United States v. Doamarel*, 567 F. Supp. 254, 262-63 (D. Del. 1983) (applying *Chapman* harmless error test to wrongful admission of guilty plea evidence and concluding that error was harmless due to limiting instruction and overwhelming evidence against the defendant); *United States v. Elizondo*, 277 F. Supp. 2d 691, 703 (S.D. Tex. 2002) (noting that "[t]he [c]ourt's error in admitting [the d]efendant's guilty plea and conviction will not warrant a new trial if it is beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained" (internal quotation marks and citation omitted)).

**{45}**    In addition, the United States Supreme Court has explained that error can be analyzed under a harmless error test when the case involves "error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." *Arizona v. Fulminante*, 499 U.S. 279, 307-08 (1991). Thus, the harmless error test has been applied to the admission of a defendant's confession in violation of his constitutional rights, *Milton v. Wainwright*, 407 U.S. 371, 376 (1972), the admission of a coerced confession, *Fulminante*, 499 U.S. at 295, and the admission of an accomplice's statements in violation of the confrontation clause. *State v. Alvarez-Lopez*, 2004-NMSC-030, ¶ 32, 136 N.M. 309, 98 P.3d 699 (applying harmless error test to the erroneous admission of an accomplice's confession). The erroneous admission of evidence of a defendant's attempted guilty plea, like the erroneous admission of a coerced confession or a statement admitted in violation of the confrontation clause, is a defect in the presentation of evidence to the jury and "may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." *Fulminante*, 499 U.S. at 307-08. Here, the erroneous admission of evidence that Defendant attempted to plead guilty is not the type of error that affects the

structure of the trial and requires automatic reversal such as deprivation of the right to counsel, trial before a biased judge, or the race-based exclusion of potential jurors. *See Fulminante*, 499 U.S. at 310 (discussing the types of cases that are not subject to harmless error analysis because they affect the very structure of the trial).

**{46}**     Because the erroneous admission of Defendant's attempt to plead guilty could touch upon various constitutional rights, we disagree with the dissent's conclusion that a violation of Rule 11-410 is not subject to the harmless error analysis stated in *Chapman*. That test requires us to determine "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction," and we "must be able to conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error." *State v. Johnson*, 2004-NMSC-029, ¶ 9, 136 N.M. 348, 98 P.3d 998 (internal quotation marks, citations and alteration omitted). This requires us to carefully consider "the error's possible impact on th[e] evidence" and "[i]f, at the end of that examination, we conclude there is a reasonable possibility the evidence complained of might have contributed to the conviction, we must reverse." *Id.* ¶ 10. Applying that analysis, we cannot conclude that there is a reasonable possibility that the admission of the evidence that Defendant attempted to plead guilty affected the jury's verdict in this case.

**{47}**     Our Supreme Court in *Johnson* provided a framework for our analysis. That case addressed whether a confrontation clause violation amounted to harmless error and adopted a number of factors to consider. These factors include:

> the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Id.* ¶ 11 (internal quotation marks and citation omitted). We believe that these factors are useful in the context of the present issue involving the erroneous admission of an attempted guilty plea.

**{48}**     Our Supreme Court's application of these factors in *Johnson* provides further guidance. The Court determined that an erroneously admitted statement constituted reversible, not harmless, error. Regarding the first factor, the statement "provided the only direct evidence of guilt with respect to th[e] theory of armed robbery," and there was, therefore, "a reasonable possibility that its erroneous admission contributed to the verdict." *Id.* ¶ 32. With respect to a separate charge of accomplice liability, the Court held that "[w]hile there is much other circumstantial evidence from which reasonable inferences of [the d]efendant's guilt might have been derived, [the erroneously admitted] statement provides the direct evidence of [the d]efendant's intent to commit armed robbery that rendered such inferences unnecessary" and the "only direct evidence that [the d]efendant was armed." *Id.* ¶ 36. The Court therefore concluded that the statement was "of central

16

importance to the prosecution's case." *Id.* Applying the second factor, the Court rejected the State's argument that the evidence was merely cumulative because "[t]o the extent the evidence corroborates, and therefore strengthens, the prosecution's evidence, it cannot be deemed 'cumulative' as we understand that term." *Id.* ¶ 37. The Court explained that cumulative evidence is additional evidence that supports a fact already established by existing evidence, while corroborative evidence tends to confirm a point suggested by other evidence but not already proved. *Id.* ¶ 39. Finally, the Court noted that the defendant's testimony contradicted the evidence that had been erroneously admitted and that the jury would have had to make a credibility determination in favor of the erroneously admitted evidence in order to disregard the defendant's testimony and convict him. *Id.* ¶ 43. Based on its analysis of these factors, the Court determined that it could not conclude beyond a reasonable doubt that the evidence did not contribute to the defendant's conviction. *Id.*

**{49}** Similarly, in *Elizondo*, a case cited by the dissent, the court concluded that its admission of evidence that a defendant had pleaded guilty was not harmless error because "[t]he remaining evidence against [the d]efendant, though probably legally sufficient to sustain a verdict, was not so strong that the [c]ourt can with any confidence say that evidence of the guilty plea and conviction did not have a substantial impact on the jury's verdict." 277 F. Supp. 2d at 704. The court also noted that the other evidence of the defendant's knowledge, an essential element of the crime charged, "was limited and circumstantial." *Id.*

**{50}** In this case, in contrast to *Johnson* and *Elizondo*, we are able to conclude beyond a reasonable doubt that the erroneous admission of Defendant's attempted guilty plea did not contribute to the jury's verdict. Unlike the case against the defendant in *Johnson*, the case against Defendant here was not comprised solely of circumstantial evidence that the erroneously admitted evidence served to corroborate. Instead, the State in this case offered direct evidence that Defendant had committed aggravated stalking, including Tamisha's eyewitness testimony that Defendant had threatened her on multiple occasions and the similar eyewitness testimony of Samantha and Hope regarding Defendant's multiple threats toward Tamisha.

**{51}** In addition, Officer Guinn testified that Defendant stated that he was going to make Tamisha "feel his pain," that he was going to put the fear of God in her, and that he had sat down in front of Tamisha's residence after receiving the TRO in order to "inflict[] pain" on her. Finally, Officer Jackson testified that Defendant admitted to him that the night he received the TRO, Defendant had stopped by Tamisha's house and "left a note on her door" and had sat outside Tamisha's house "[t]o instill fear in her."

**{52}** Thus, at the time that the State's witness testified that Defendant had attempted to plead guilty, the jury had already heard an overwhelming amount of eyewitness testimony proving that Defendant had engaged in a pattern of threatening behavior directed at Tamisha. More importantly, the jury had already heard testimony from Officers Jackson and Guinn that Defendant had admitted that he had done everything that Tamisha had accused him of. The testimony that Defendant had attempted to plead guilty and had stated that everything

17

Tamisha had said about him was true, therefore, merely repeated Defendant's admissions of guilt that were already properly before the jury. Consequently, the guilty plea evidence was truly cumulative evidence that simply reiterated evidence already before the jury. The erroneously admitted evidence was not, as the dissent argues, corroborative evidence that merely strengthened the prosecution's case. In addition, when Defendant took the stand in his own defense, he did not offer any testimony that was inconsistent with his guilty plea. Defendant did not deny that he had engaged in the pattern of threatening conduct that gave rise to his aggravated stalking conviction; instead, Defendant admitted that he had done everything Tamisha had accused him of and maintained that he did not really intend to threaten or actually harm her. As a result, the State's cross-examination of Defendant was far from "devastating," Dissent ¶ 54, because the State simply re-emphasized evidence that had already been admitted through other witnesses and that had nothing to do with the attempted guilty plea. Because the erroneously admitted testimony was cumulative and was not central to the prosecution's case or contradicted by any other evidence in the record, we are able to conclude beyond a reasonable doubt that the admission of Defendant's attempted guilty plea did not contribute to his conviction. We, therefore, hold that the error caused by the admission of the testimony that Defendant attempted to plead guilty was harmless.

{53}    We further disagree with the dissent's contention that the admission of Defendant's attempted guilty plea may have forced him to take the stand in violation of his constitutional rights. Defendant never disputed the occurrence of the threatening actions about which the eyewitnesses had testified. Instead, while cross-examining the State's witnesses, defense counsel sought only to show that Defendant did not really intend to harm Tamisha. Because his defense was based on his intentions when he threatened Tamisha, not whether he had actually threatened her, we cannot conclude that the admission of the guilty plea forced Defendant to take the stand in his own defense. The only way that Defendant could establish that he did not mean that he would actually harm Tamisha when he threatened to harm her was by testifying that his threats were empty. Without Defendant's testimony, the case would have rested on the State's case, which overwhelmingly proved that Defendant had engaged in a pattern of threatening behavior sufficient to find him guilty of aggravated stalking. In light of this, it is unlikely that Defendant would have contemplated a different defense theory even if the evidence of the attempted guilty plea had not been admitted.

{54}    Finally, the dissent argues that the State has failed to meet its burden of showing that any error caused by the admission of the attempted guilty plea was harmless beyond a reasonable doubt. While we agree that this is the State's burden, *Chapman*, 386 U.S. at 24; *Johnson*, 2004-NMSC-029, ¶ 9, we decline to reverse on the technical basis of the State's failure to argue harmless error. We have analyzed the State's violation of Rule 11-410 using the *Chapman* constitutional error test even though Defendant did not argue on appeal that this violation rose to the level of constitutional error. It would be patently unfair to require the State to address an argument in its answer brief in response to an argument that was not raised by Defendant. In addition, *Chapman* ultimately requires only that "the court must be able to declare a belief that [the error] was harmless beyond a reasonable doubt." 386 U.S. at 24. Because we are able to reach this conclusion on our own review of the record, we do

18

not believe that the State's failure to meet a burden that it was unaware had been imposed on it requires us to rule in favor of Defendant. *See State v. Romero*, 2006-NMCA-045, ¶ 69, 139 N.M. 386, 133 P.3d 842 (applying harmless error review where the state did not argue that error was harmless).

**CONCLUSION**

**{55}**　For the foregoing reasons, we affirm Defendant's conviction for aggravated stalking.

**{56}**　**IT IS SO ORDERED.**

_____

**CYNTHIA A. FRY, Chief Judge**

**I CONCUR:**

_____

**JAMES J. WECHSLER, Judge**

_____

**MICHAEL E. VIGIL, Judge (concurring in part, dissenting in part)**.

**Vigil, Judge (concurring in part, dissenting in part).**

**{57}**　I concur with the majority opinion except Part C in which it concludes that improperly admitting evidence before the jury that Defendant attempted to plead guilty did not constitute reversible error. For the reasons which follow, I respectfully submit that Defendant is entitled to a new trial in which the improper evidence is excluded from the jury's consideration. Since the majority disagrees, I dissent.

**FACTS**

**{58}**　On January 31, 2006, Officer Guinn arrested Defendant and booked him into the Otero County Detention Center on a felony charge of aggravated stalking. Officer Guinn noted that Defendant was to appear in court "when called upon." Three days later on February 3, 2006, Defendant was brought before the magistrate court for his first appearance. Because a felony is not within the jurisdiction of the magistrate court, at a first appearance the magistrate judge only advises the defendant of the charge, the penalty provided, his rights, and sets the matter for a preliminary hearing. Rule 6-501(A), (D) NMRA. "In actions not within magistrate trial jurisdiction, no plea shall be entered." Rule 6-302(A) NMRA. At Defendant's first appearance the magistrate judge noted that Defendant wanted an attorney, wanted to consult with counsel, and wanted a trial by jury.

Since Defendant was indigent and incarcerated, it was ordered that a public defender represent Defendant.

**{59}**    After he obtained counsel, Defendant entered a plea of not guilty, and a jury trial was held in the district court on the felony charge. The State presented the testimony of Tamisha, Tamisha's friend Samantha, Officer Guinn, and Officer Jackson and established the facts set forth in paragraphs 2-6 of the majority opinion. Except to the extent raised by the *Miranda* issue addressed in Part B of the majority opinion, Defendant does not challenge on appeal the testimony of these witnesses or the facts established by their testimony.

**{60}**    The State's last witness at trial was Ms. Gilmore, a victim advocate with the district attorney's office. She testified that she attended Defendant's first appearance in the magistrate court. Defendant and whoever else was in jail were shown a videotape which explained to the prisoners their rights. When the videotape was played, no attorney was present to advise Defendant. After the video was played to the group of prisoners, Ms. Gilmore said that the magistrate judge read the criminal complaint to Defendant, and the magistrate judge asked Defendant to plead to the charge. Ms. Gilmore testified that Defendant stated "he wanted to plead guilty." Defense counsel immediately objected and, at a bench conference, argued that the testimony was highly improper and related to an attempt to plead guilty without the presence of counsel. Defendant moved for a mistrial. Arguing that the evidence was admissible, the prosecutor said, "The proffer is that . . . Defendant began to talk about I just want to go to Arkansas, everything that the victim said is true, I just want to plead guilty. We believe that's an admission of guilt. It's—it's admissible." After further argument, the district court ruled that the prosecutor could lay a foundation for admission of the evidence.

**{61}**    Ms. Gilmore then testified that the magistrate court utilizes a video arraignment procedure. Ms. Gilmore said that the practice is for a videotape to be played explaining to the prisoners their rights and that if they have a felony charge, this constitutes their first appearance and if they have a misdemeanor charge, this is their arraignment. After the ten-minute video is played, the magistrate judge calls each prisoner one at a time and they sit in a chair and he talks to them through a video monitor. While seated in the chair, the defendant is able to see the judge on a video monitor, and the judge is likewise able to see the defendant on a video monitor from his location. There is a third video monitor in the jail which is pointed at the audience so the public can see and hear the entire process. The magistrate judge then asks each defendant whether he observed and understood the videotape. On the basis of this testimony and over Defendant's objection, the district court ruled that the State established a foundation to admit Ms. Gilmore's testimony.

**{62}**    Ms. Gilmore then told the jury that Defendant acknowledged to the magistrate judge that he understood the rights explained by the videotape and said he wanted to plead guilty. The magistrate judge advised Defendant he could not accept a guilty plea because he was charged with a felony, and Ms. Gilmore said that Defendant replied, "[b]ut I'm not denying anything that she has said. I just want to go back to Arkansas."

20

**{63}** Defendant testified in his own defense. He began his testimony by explaining why he had tried to plead guilty in the magistrate court:

> Well, in that particular occasion, with everything I heard from everybody in New Mexico in jail, if I pleaded guilty, then my trial would go faster. And that's basically all I really wanted was for my trial to go faster. Not knowing anybody in New Mexico and not having any family and friends, I just wanted to get back home.

Defendant then denied committing the acts Tamisha accused him of. Explaining why he had said in the magistrate court that he agreed with what Tamisha was saying, Defendant testified, "[b]ecause as I said earlier, I just didn't want to fight about this any more. I felt like my chances of winning this case against a female this county knows [were not good], so my best bet would be to plead guilty, get this over with, and get back home as soon as possible."

**{64}** Not surprisingly, the prosecutor's cross examination of Defendant was detailed and devastating.

> Q. Do you recall being arraigned at the video arraignment over in Magistrate Court? You're in jail, video machine is set up; is that correct?
>
> A. Yes, sir.
>
> Q. And you remember you had to watch a videotape; is that correct?
>
> A. Yes, sir.
>
> Q. And the Judge came on the screen and called you up to the chair and asked you are you Christopher Smile? You know that?
>
> A. Yes, sir.
>
> Q. You remember that?
>
> A. Yes, sir.
>
> Q. Okay. Do you remember the Judge asking you if you watched the videotape and understood it?
>
> A. Yes, sir.
>
> Q. And you remember saying that yes, you watched it, and you understood it?

21

A.      Yes, sir.

Q.      And do you remember the Judge asking you how do you plead, and you said I plead guilty. Is that correct?

A.      Yes, sir.

Q.      And do you recall telling the Judge or the Judge telling you he couldn't take the guilty plea because it was a felony?

A.      Yes.

Q.      And do you remember saying at that time everything that Tamisha said was true?

A.      Yes, sir.

Q.      I just want to plead guilty and go back to Arkansas. Is that what you said?

A.      Yes, sir.

Q.      Now, at the time of that arraignment, you were being arraigned on aggravated stalking in that courtroom; isn't that true?

A.      Yes, sir.

Q.      And you said everything she said about aggravated stalking was true, correct?

A.      I never specified what she said was true, never said everything she said was true, I didn't specify what.

Q.      Well, you were being arraigned for aggravated stalking; do you agree with that?

A.      That doesn't mean that I was agreeing to the fact that—I was agreeing to the fact that she charged me with aggravated stalking.

Q.      Well, let's just try to agree to disagree on some stuff. This was on date of arraignment, you already said you agreed to—you tried to plead guilty. Do you agree that you said, "Everything that Tamisha said was true"?

22

A. Yeah.

Q. Now, when those questions are—you understand that you were being arraigned for aggravated stalking, is that correct?

A. Yes, sir.

Q. Do you understand and recognize that the Judge read you the elements of the crime of aggravated stalking?

A. Yeah. (Inaudible) evidence of what it came to be aggravated stalking, and I'm pretty sure I would be kind of upset about being locked up for six months over it.

Q. And do you understand—or do you agree that he told you the—well, I won't go into that.

But you knew that there would be repercussions for you saying that; is that fair enough?

A. Yes, sir.

Q. Okay. Now, in your cross—or direct examination with [your counsel], you said—tried to make an excuse for this. You said—basically, you said everything she said was true only because you wanted to magically get out of jail, go take care of your baby girl in Arkansas. Is that what you said?

A. First of all, it wasn't an excuse, it was a true statement.

Q. Okay. So when you talked to [the] Judge . . . and you said everything Tamisha said was true, are you saying that you were lying to a Judge?

A. No, I wasn't lying to anybody.

Q. Well, was this a true statement, everything—

A. Yes, it was true.

\* \* \*

23

Q.    Mr. Smile, so what you're saying now is when you said everything Tamisha said was true, that is a true statement?

A.    Yes, it is.

Q.    So your statement earlier today with [your counsel on direct] that that wasn't true, was that a lie?

A.    I never said it wasn't true.  The only thing I ever said was—what I said and what the truth—because I wanted to go back home to be with my child.  That's all I've been wanting for the last six months was to see my daughter.

**ANALYSIS**

**{65}**   I agree with the majority that Rule 11-410 of the Rules of Evidence was clearly violated.  *See* Majority Opinion ¶¶ 39-41.  Rule 5-304(F) NMRA of the Rules of Criminal Procedure was also violated.  This rule is equally clear and unambiguous and in almost the same language directs:

> Evidence of a plea of guilty, later withdrawn . . . or of an offer to plead guilty [or] no contest . . . to the crime charged or any other crime, or of statements made in connection with any of the foregoing pleas or offers, is not admissible in any civil or criminal proceeding against the person who made the plea or offer.

*Id.*

**{66}**   The fact that evidence of Defendant's *offer* to plead guilty was admitted, as opposed to evidence of an *actual* plea, makes no substantive difference, and the majority agrees.  Majority Opinion ¶ 42.  Rules 11-410 and 5-304(F) equate offers to plead guilty with actual guilty pleas.  Moreover, the cases which have considered whether such a distinction makes a difference have concluded it does not.  *See State v. McGunn*, 294 N.W. 208, 209 (Minn. 1940) (concluding that a conditional offer to plead guilty to the court, which the court did not accept, is to be treated the same as a withdrawn guilty plea); *State v. Meyers*, 12 S.W. 516, 519 (Mo. 1889) (holding that evidence of an earlier rejected guilty plea was not admissible); *overruled on other grounds*, *Ex Parte Keet*, 287 S.W. 463 (Mo. 1926); *Dykes v. State*, 372 S.W.2d 184, 186 (Tenn. 1963) (equating an offer to plead guilty with an actual plea that is withdrawn); *Dean v. State*, 161 S.W. 974, 975 (Tex. Crim. App. 1913) (concluding that an offer of the defendant's counsel to plead guilty was not admissible).

**{67}**   I first part company with the majority in its conclusion that the error in this case is subject to a harmless error analysis.  Majority Opinion ¶ 43.  Because of the nature of statements made to a judge in a judicial proceeding while pleading guilty or offering to plead

guilty, the erroneous admission of such statements into evidence is not subject to a harmless error analysis.

**{68}** It is beyond debate that the best evidence of whether a competent accused committed a violation of the criminal law is his own statement that he committed the act with the requisite intent. This is exactly what a guilty plea is, and the probative force of such evidence cannot be overlooked. When a defendant proceeds to trial, it is on the basis of a "not guilty" plea. Allowing the State to introduce evidence of an attempt to plead guilty nullifies the entire basis for the trial. The resulting prejudice is so obvious and so overwhelming that when a defendant's prior attempt to plead guilty to a judge is improperly admitted into evidence, reversible error is committed regardless of what the remaining evidence in the case may be.

**{69}** The majority asserts that the admission of Defendant's attempted guilty plea into evidence did not constitute structural error. Majority Opinion ¶ 45. I disagree. Defendant's constitutional right to the presumption of innocence instantly evaporated the moment Ms. Gilmore told the jury that when Defendant appeared before the magistrate judge, Defendant said he "wanted to plead guilty," and that "I'm not denying anything that she [Tamisha] has said."

**{70}** In *Coffin v. United States*, 156 U.S. 432, 453 (1895), the United States Supreme Court declared:

> The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law.

Furthermore, the "presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial." *Estelle v. Williams*, 425 U.S. 501, 503 (1976). What occurred in this case deprived Defendant of a "basic component of a fair trial." *Id.* The very foundation of how we administer our criminal justice system is weakened when we sanction subjecting such an error to a harmless error analysis. I therefore conclude that structural error occurred in this case.

**{71}** It is the public policy in New Mexico to encourage, not to discourage, plea agreements. "Guilty pleas are an essential part of our criminal justice system[.]" *Trujillo*, 93 N.M. at 727, 605 P.2d at 235. In order to facilitate plea discussions, our Supreme Court has declared

> Rule [11-]410 does not set up standards of relevancy and trustworthiness, and we will not impose any on it. If a plea is never entered or entered and then withdrawn, at trial it is to appear as though the earlier plea and/or plea discussions never took place. The slate is wiped clean once plea negotiations fail or the defendant withdraws his plea.

&ast;   &ast;   &ast;

> [A] weighing of conflicting policies demonstrates that the balance is tipped in favor of interpreting Rule [11-]410 as the cloak of privilege around plea negotiation discussions.

*Trujillo*, 93 N.M. at 727, 605 P.2d at 235. The majority acknowledges this is the rule in New Mexico. Majority Opinion ¶ 42. However, the majority fails to acknowledge that this public policy places New Mexico squarely in line with the United States Supreme Court and other state courts that conclude that the admission into evidence of an aborted guilty plea constitutes reversible error.

**{72}** *Kercheval*, 274 U.S. at 223, establishes the federal evidentiary rule that admitting a withdrawn guilty plea into evidence constitutes reversible error, regardless of why the plea was withdrawn. The reasoning is particularly applicable here:

> The effect of the court's order permitting the withdrawal was to adjudge that the plea of guilty be held for naught. Its subsequent use as evidence against [the defendant] was in direct conflict with that determination. When the plea was annulled it ceased to be evidence. By permitting it to be given weight [by the jury] the court reinstated it pro tanto.

*Id.* at 224. The Supreme Court further observed that a trial is based upon a plea of not guilty which is substituted for the prior guilty plea. *Id.* Therefore, allowing the withdrawn plea to be admitted into evidence for the jury's consideration places a defendant "in a dilemma utterly inconsistent with the determination of the court awarding him a trial." *Id.* The Supreme Court did not discuss or analyze whether the evidence was otherwise sufficient to sustain the conviction. *See also State v. Jackson*, 325 N.W.2d 819, 822 (Minn. 1982) (holding that statements made in connection with a withdrawn plea are to be treated as if they were never made, and reversing the defendant's conviction where statements he made in connection with a plea agreement were admitted into evidence to impeach his trial testimony); *People v. Heffron*, 399 N.Y.S.2d 501, 504, 506 (N.Y. App. Div. 1977) (noting that the argument for reversal was compelling because in cross examination of the defendant concerning a withdrawn guilty plea, the prosecutor asked the defendant whether he lied when he entered the plea. Although there was no objection to the questioning, the court reversed because the error was "so fundamental and prejudicial as to require a new trial in the interest of justice"); *State v. Hayes*, 172 N.W.2d 324, 325-26 (Minn. 1969) (reversing the conviction in a bench trial where evidence of a withdrawn guilty plea in a prior arraignment for the same offense was admitted); D. Welch, Annotation, *Propriety and Prejudicial Effect of Showing, in Criminal Case, Withdrawn Guilty Plea*, 86 A.L.R.2d 326, §§ 4, 8, at 331-35, 338-39 (1962) (collecting cases and noting it is the rule in many jurisdictions that admission into evidence of a withdrawn guilty plea is reversible error because it is not admissible for any purpose at a trial upon a plea of not guilty and that such error is not cured even by an instruction to jurors to disregard their knowledge of that fact).

**{73}** My second disagreement with the majority is how it applies the concept of harmless error to the admitted violation. The majority states that it "cannot conclude that there is a reasonable possibility that the admission of the evidence that Defendant attempted to plead guilty affected the jury's verdict in this case." Majority Opinion ¶ 46. Furthermore, the majority disagrees that the admission of Defendant's attempted guilty plea "may have forced him to take the stand in violation of his constitutional rights." Majority Opinion ¶ 53. These conclusions appear to be grounded upon a conclusion that the attempted plea was nothing more than cumulative evidence. Majority Opinion ¶¶ 50-52.

**{74}** The admission into evidence of Defendant's attempt to plead guilty and statements he made in connection with that attempt violated, touched upon, and implicated various constitutional rights of Defendant. Two constitutional rights of Defendant were squarely violated. *Trujillo* mandates that where a plea fails, "at trial it is to appear as though the earlier plea and/or plea discussions never took place." 93 N.M. at 727, 605 P.2d at 235. Stated another way, at trial Defendant was entitled to every constitutional safeguard and presumption associated with a plea of "not guilty." Because of the nature of a guilty plea, which I have already discussed, improperly admitting into evidence Defendant's attempt to plead guilty destroyed Defendant's constitutional presumption of innocence. In addition, the State's improper use of Defendant's statements made in connection with his offer to plead guilty resulted in him testifying against himself "in substance if not in form." *See Wood v. United States*, 128 F.2d 265, 274 (D.C. Cir. 1942) (using this language). Once Defendant's statements in connection with the attempted plea were improperly admitted, his constitutional right to remain silent was destroyed. He had to testify about the plea if he was to have any hope of overcoming its effect on the jury. *See Spitaleri*, 173 N.E. 2d at 37 (stating that after the defendant's withdrawn guilty pleas was improperly admitted into evidence, he was "in effect forced to take the stand" to explain that although he was innocent, he pleaded guilty because his lawyer promised him a suspended sentence). Finally, *State v. Reardon*, 73 N.W.2d 192, 195 (Minn. 1955), squarely holds that the admission into evidence of a withdrawn guilty plea violates the due process protected by both the United States Constitution and the Minnesota Constitution.

**{75}** There are additional constitutional rights which are touched upon or implicated in this case. The record establishes that a videotape was shown to a group of prisoners in jail, which included Defendant, that explained to the prisoners their "rights." However, the videotape is not before us, so we do not know its contents. We do know, however, that Defendant had no attorney when the videotape was played and he offered to plead guilty. Whether Defendant was afforded his constitutional right to counsel and whether there was a valid waiver of this constitutional right are both implicated. *See State v. Melendez*, 397 A.2d 1117, 1118, 1120 (N.J. Super. Ct. App. Div. 1979) (per curiam) (concluding that the defendant's constitutional right to counsel was violated when he pleaded guilty at his first appearance because it was made without counsel or a valid waiver of counsel, and directing that "[n]o admissions made by defendant during the original arraignment shall be admissible in evidence against him in the event he is retried"). Secondly, we have no basis for concluding whether Defendant validly waived his constitutional right against self-

incrimination when he offered to plead guilty. This constitutional right is also implicated. *See United States ex rel. Spears v. Rundle*, 268 F. Supp. 691, 699 (E.D. Pa. 1967), *aff'd*, 405 F.2d 1037 (3d Cir. 1969) (concluding that a guilty plea cannot operate as a waiver of the constitutional right against self-incrimination if there was no valid waiver of that privilege in making the plea itself).

**{76}** Under *Chapman*, in order to hold that constitutional error does not require reversal, we must be able to conclude that the error was "harmless beyond a reasonable doubt." 386 U.S. at 24; *Johnson*, 2004-NMSC-029, ¶ 8; *State v. Alvarez-Lopez*, 2004-NMSC-030, ¶ 25. The burden lies with the State to demonstrate that the error is harmless beyond a reasonable doubt. *Johnson*, 2004-NMSC-029, ¶ 9; *Alvarez-Lopez*, 2004-NMSC-030, ¶ 25. However, the State makes no argument of harmless error. Specifically, the State's brief fails to make any assertion or argument attempting to demonstrate that there is no reasonable possibility that admitting Defendant's statements and attempt to plead guilty into evidence contributed to his conviction. *See Johnson*, 2004-NMSC-029, ¶ 11 (stating the central focus in determining whether constitutional error was harmless is "whether there is a reasonable possibility the erroneous evidence might have affected the jury's verdict").

**{77}** In my independent examination of the record, I cannot conclude beyond a reasonable doubt that the error in admitting this evidence was harmless. In *Alvarez-Lopez*, our Supreme Court noted *Fulminante* in which the United States Supreme Court "was faced with determining whether a criminal defendant's involuntary confession, which was unconstitutionally admitted into evidence against him at his trial, contributed to his conviction." *Alvarez-Lopez*, 2004-NMSC-030, ¶ 34. Our Supreme Court agreed that

> [C]onfessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so. . . . [A] full confession in which the defendant discloses the motive for and means of the crime may tempt the jury to rely upon that evidence alone in reaching its decision. . . . [T]he risk that the confession is unreliable, coupled with the profound impact that the confession has upon the jury, requires a reviewing court to exercise extreme caution before determining that the admission of the confession at trial was harmless.

*Id.* ¶ 34 (quoting *Fulminante*, 499 U.S. at 296). *See also United States v. Leon-Delfis*, 203 F.3d 103, 112 (1st Cir. 2000) ("Confessions are by nature highly probative and likely to be at the center of the jury's attention."). This reasoning has even greater force where a guilty plea is concerned. As I have already noted, a judicial guilty plea has its own unique probative weight which is virtually impossible to overlook. In the words of the United States Supreme Court, "A plea of guilty differs in purpose and effect from a mere admission or an extrajudicial confession; *it is itself a conviction*." *Kercheval*, 274 U.S. at 223 (emphasis added).

28

**{78}** In *Elizondo*, the defendant was convicted of conspiracy to possess with intent to distribute, and conspiracy to distribute, cocaine in federal court. 277 F. Supp. 2d at 692. The federal judge admitted into evidence the defendant's guilty plea in state court, together with the state judgment of conviction, that he possessed the same drugs. *Id.* at 697. The defendant was granted a new trial after the judge concluded that he improperly admitted this evidence. *Id.* at 703-04. Applying *Chapman*, the judge found "there is a significant possibility that admission of [the d]efendant's state court guilty plea and conviction had a substantial impact on [the d]efendant's conviction on the federal conspiracy charge." The judge first recognized that "admission of the guilty plea likely had an even greater impact on the verdict than admission of the conviction itself." *Id.* at 703. The judge then went further and candidly acknowledged the effect it had upon the court itself when he denied the defendant's motion for a directed verdict. *Id.* at 703-04. When he denied the defendant's motion, the judge had said, "Well, I don't know of a better form of demonstration of knowledge [of the drugs] than somebody pleading guilty to it." *Id.* at 704.

**{79}** Under the circumstances of this case, it is not possible to conclude that the error was harmless beyond a reasonable doubt. *See Johnson*, 2004-NMSC-029, ¶ 10 (directing that if we conclude, "there is a reasonable possibility the evidence complained of might have contributed to the conviction" after examining the admissible evidence and the possible impact of the error on that evidence, "we must reverse").

**{80}** *Johnson* and *Alvarez-Lopez* both teach that constitutional error cannot be deemed harmless simply because there is overwhelming evidence of a defendant's guilt. *Johnson*, 2004-NMSC-029, ¶ 11; *Alvarez-Lopez*, 2004-NMSC-030, ¶ 32. Among the reasons given are the recognition that appellate courts are "poorly equipped" to determine guilt or innocence. *Id.* ¶ 29. Furthermore, defendants have a constitutional right to have a jury decide guilt or innocence, not appellate judges reviewing the evidence on appeal, *id.* ¶ 27, and we cannot take the risk that the appellate court—the wrong entity—is adjudging the defendant's guilt. *Id.* ¶ 28. Consistent with the jury trial guarantee, the inquiry "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Id.* ¶ 27 (internal quotation marks and citation omitted). Perhaps most compelling, "we risk inadvertently concluding that constitutional error was harmless simply because there was substantial evidence to support the conviction." *Id.* ¶ 30. Accordingly, when constitutional error has infected a trial, a jury verdict is not automatically afforded deference. *Id.* "Rather, in a proper harmless error analysis, the appellate court defers to the jury verdict *only* when the State has established beyond a reasonable doubt that the jury verdict was not tainted by the constitutional error." *Id.*

**{81}** As a policy matter, we must be cognizant that our criminal justice system, and our federal and state constitutions, "protect other values besides the reliability of the guilt or innocence determination." *Id.* ¶ 31 (internal quotation marks and citation omitted). A harmless error analysis which focuses solely on whether overwhelming evidence supports a guilty verdict does not adequately protect those values. *Id.* In this regard, I agree with the

29

following statement from *Reardon*, 73 N.W.2d at 195, which answered the state's argument that whether there was prejudice requiring a new trial when a withdrawn guilty plea was admitted into evidence was determined by whether or not the error affected the result.

> The state contends that whether or not there was prejudice requiring a new trial is determined by whether or not the error affected the result. There is authority for this proposition—but where the constitutional right to a fair trial is denied, we are unwilling to adopt a theory which in effect assumes that, where proof is strong, due process may be suspended. . . . It is true there is cogent evidence to support the verdict; and it may be expected that on a second trial the result would be the same. But to allow factually strong cases to erode such a basic right is to deny the existence of the right.

*Id.* (citations and footnotes omitted).

**{82}**     Notwithstanding the weight of the remaining evidence against Defendant, the State has failed to demonstrate that the verdict was not tainted by the error. The majority's attempt to demonstrate harmless error fails. Again, evidence of Defendant's attempt to plead guilty has a unique evidentiary weight, and simply reciting what other evidence the State presented does not demonstrate harmless error.

**{83}**     Finally, I disagree with the majority conclusion that Defendant's attempt to plead guilty was "truly" cumulative. Majority Opinion ¶ 52. *Johnson* states, "To the extent the evidence corroborates, and therefore strengthens, the prosecution's evidence, it cannot be deemed 'cumulative' as we understand that term. 2004-NMSC-029, ¶ 37. Again, given the nature and effect of a guilty plea, the improper evidence in this case not only corroborated and strengthened the State's case, it did so beyond any reasonable doubt. Even if the evidence viewed as merely cumulative, "improperly admitted evidence that is cumulative is not *ipso facto* harmless beyond a reasonable doubt: the reviewing court must further inquire into the *effect* that evidence might have had on the jury's verdict." *Id.* In this case, it cannot be assumed that the improper evidence had no effect on the verdict in this case.

**CONCLUSION**

**{84}**     For all the foregoing reasons, I would reverse Defendant's conviction and remand the case for a new trial.

_____

**MICHAEL E. VIGIL, Judge**

Topic Index for *State v. Smile,* No. 27,338

AE                         APPEAL AND ERROR
AE-HE                  Harmless Error

30

**CA**                **CRIMINAL PROCEDURE**
CA-GP           Guilty Plea

**CL**                **CRIMINAL LAW**
CL-ST            Stalking

**CT**                **CONSTITUTIONAL LAW**
CT-MW         Miranda Warnings
CT-PI             Presumption of Innocence
CT-SU           Suppression of Evidence
CT-VO           Vague or Overbroad

**RE**                **REMEDIES**
RE-PO           Protective Order

**ST**                **STATUTES**
ST-IP            Interpretation