**Certiorari Denied, August 8, 2016, S-1-SC-35993**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2017-NMCA-001**

**Filing Date: May 11, 2016**

**Docket No. 33,514**

**STATE OF NEW MEXICO,**

    **Plaintiff-Appellee,**

**v.**

**SHARON DUTTLE,**

    **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY**
**Douglas R. Driggers, District Judge**

Hector H. Balderas, Attorney General
Margaret E. McLean, Assistant Attorney General
Joel Jacobsen, Assistant Attorney General
Santa Fe, NM

for Appellee

Bennett J. Baur, Chief Public Defender
J.K. Theodosia Johnson, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**OPINION**

**ZAMORA, Judge.**

**{1}**     Defendant Sharon Duttle was convicted of one count of dogfighting contrary to NMSA 1978, § 30-18-9 (2007); one count of conspiracy to commit dogfighting, contrary to NMSA 1978, § 30-28-2 (1979) and Section 30-18-9; ten counts of cruelty to animals, contrary to NMSA 1978, § 30-18-1(B) (2007); eight counts of extreme cruelty to animals,

1

contrary to Section 30-18-1(E); and one count of owning or maintaining more than six dogs and/or cats without a multiple animal site permit contrary to Doña Ana County, N.M., Doña Ana County Animal Controls Ordinance ch. 134, 203-2002 § 4.2 (2002), *repealed by* Doña Ana County, N.M., Doña Ana Animal Controls Ordinance ch. 134, 266-2013 (2013). On appeal, Defendant does not challenge her convictions for dogfighting, conspiracy to commit dogfighting, or her violation of the Doña Ana County Animal Controls Ordinance.

**{2}** Defendant challenges her convictions for cruelty to animals and extreme cruelty to animals by raising ten issues. Three of the issues are addressed in this formal opinion, and the remaining seven issues have been addressed in a separate memorandum opinion. *State v. Duttle*, No. 33,524, mem. op. (N.M. Ct. App. ____ __, 20__) (non-precedential).

**{3}** Defendant argues that (1) the animal cruelty statute is unconstitutionally vague; (2) her conduct is insufficient to support her convictions for extreme cruelty to animals; and (3) her convictions for cruelty to animals and extreme cruelty to animals are not supported by sufficient evidence.

**{4}** We hold that the animal cruelty statute is not unconstitutionally vague and that Defendant's behavior falls within the conduct the Legislature intended to punish as cruelty and extreme cruelty to animals under Section 30-18-1(B) and (E). We further hold that there was sufficient evidence to support her convictions for cruelty to animals and extreme cruelty to animals. As a result, we affirm Defendant's convictions.

## I.    BACKGROUND

**{5}** Doña Ana County Animal Control was contacted about numerous dogs kept on Defendant's property in a manner consistent with preparations for staged dogfighting. Doña Ana County Sheriff's Department Investigator Robyn Gojkovich, an animal cruelty specialized investigator, went to Defendant's property to conduct a welfare check on the dogs.

**{6}** Because of the outside conditions in which the dogs were kept, that numerous dogs were chained to stakes, the unknown number of dogs, and the lack of vaccination records, among other things, Investigator Gojkovich obtained a search warrant to check on the health and welfare of the dogs.

**{7}** The initial search of Defendant's property revealed seven dogs being kept inside Defendant's residence. The dogs were either gravely ill or had fresh wounds consistent with staged dogfighting. Investigator Gojkovich also found the presence of several other items in Defendant's residence that suggested Defendant was involved in organized dogfighting. Subsequently, a second search warrant was obtained broadening the search to include evidence of organized dogfighting.

**{8}** The dogs located outdoors were found in deplorable conditions, and many of them

2

were also in poor physical condition. Animal Control officers assigned each dog a number and photographed them in the area where the dog was found. Before the dogs were removed from the property, the officers also photographed each dog's access to food, water, shade, shelter, body condition, and injuries.

**{9}** After their removal, the dogs were taken to the animal shelter where they were assessed by Animal Control officers and examined by the animal shelter veterinarian. Dr. Patricia Norris, a veterinarian with the Doña Ana County Sheriffs' Department, examined and photographed twenty-seven of those dogs. Of the thirty-eight dogs initially removed from Defendant's property, thirty-one had to be euthanized, and two died in the animal shelter as a result of severe heart worm disease and related complications.

**{10}** Defendant was indicted on one count of dogfighting, one count of conspiracy to commit dogfighting, ten counts of cruelty to animals, nine counts of extreme cruelty to animals, one count of owning or maintaining more than six animals without a multiple animal site permit, and forty counts of maintaining an unsterilized dog or cat without a permit. The latter forty counts were dismissed prior to trial. A jury convicted Defendant of one count of dogfighting, one count of conspiracy to commit dogfighting, ten counts of cruelty to animals, eight counts of extreme cruelty to animals, and one count of owning more than six animals without a multiple animal site permit. This appeal followed.

## II. DISCUSSION

### A. The Animal Cruelty Statute Is Not Unconstitutionally Vague

**{11}** Defendant contends that the extreme cruelty and cruelty to animals statute, as applied, is void for vagueness. She argues that Section 30-18-1(B) and (E) failed to provide her notice that her conduct was prohibited, and that the statutory provisions are overbroad, thereby allowing for subjective, ad hoc applications. Specifically, Defendant argues that the terms "necessary sustenance" and "torture" are unconstitutionally vague.

**{12}** "[T]he vagueness doctrine is based on the principle of fair notice in that no one may be held criminally responsible and subject to criminal sanctions for conduct without fair warning as to the nature of the proscribed activity." *State v. Lovato*, 2011-NMCA-065, ¶ 14, 150 N.M. 39, 256 P.3d 982 (internal quotation marks and citation omitted). "[A] statute denies constitutional due process if it is so vague that persons of common intelligence must necessarily guess at its meaning." *Id.* (internal quotation marks and citation omitted).

**{13}** "We review a vagueness challenge de novo in light of the facts of the case and the conduct[,] which is prohibited by the statute." *State v. Smile*, 2009-NMCA-064, ¶ 17, 146 N.M. 525, 212 P.3d 413 (internal quotation marks and citation omitted). "A strong presumption of constitutionality underlies each legislative enactment, and the party challenging constitutionality has the burden of proving a statute is unconstitutional beyond all reasonable doubt." *State v. Laguna*, 1999-NMCA-152, ¶ 24, 128 N.M. 345, 992 P.2d 896.

3

Appellate courts "have a duty to construe a statute in such a manner that it is not void for vagueness if a reasonable and practical construction can be given to its language." *State v. Segotta*, 1983-NMSC-092, ¶ 5, 100 N.M. 498, 672 P.2d 1129. When analyzing a vagueness challenge to the constitutionality of a statute, this Court applies a two-part test. *State v. Tsosie*, 2011-NMCA-115, ¶ 31, 150 N.M. 754, 266 P.3d 34. We consider whether the statute "(1) fails to provide persons of ordinary intelligence using ordinary common sense a fair opportunity to determine whether their conduct is prohibited, or (2) fails to create minimum guidelines for . . . enforcement . . . and thus encourages subjective and ad hoc application of the law." *Id.* (omissions in original) (alterations, internal quotation marks, and citation omitted); *State ex rel. Children, Youth & Families Dep't v. Shawna C.*, 2005-NMCA-066, ¶ 32, 137 N.M. 687, 114 P.3d 367 (noting that due process also requires that the statute not encourage arbitrary or discriminatory enforcement). A vagueness claim "cannot succeed if the statute clearly applied to [the defendant's] conduct." *Smile*, 2009-NMCA-064, ¶ 17 (alteration, internal quotation marks, and citation omitted).

**{14}** In determining the prohibited conduct, we review questions of statutory interpretation de novo. *See State v. Trujillo*, 2012-NMCA-112, ¶ 7, 289 P.3d 238, *cert. quashed*, 2015-NMCERT-003, 346 P.3d 1163. "[The appellate courts'] ultimate goal in statutory construction is to ascertain and give effect to the intent of the Legislature." *State v. Smith*, 2004-NMSC-032, ¶ 8, 136 N.M. 372, 98 P.3d 1022 (internal quotation marks and citation omitted). We begin "by looking first to the words chosen by the Legislature and the plain meaning of the Legislature's language." *State v. Davis*, 2003-NMSC-022, ¶ 6, 134 N.M. 172, 74 P.3d 1064 (internal quotation marks and citation omitted). "When a statute contains language which is clear and unambiguous, [the appellate courts] must give effect to that language and refrain from further statutory interpretation." *State v. Johnson*, 2001-NMSC-001, ¶ 6, 130 N.M. 6, 15 P.3d 1233 (internal quotation marks and citation omitted). Because of the factual complexity of this case, we address Defendant's constitutional arguments concerning Section 30-18-1(B) and (E), in turn.

### 1. Section 30-18-1(B)—Cruelty to Animals

**{15}** Defendant challenges Section 30-18-1(B) as unconstitutionally vague as applied to her conduct in this case. Section 30-18-1(B) defines "cruelty to animals" as "(1) negligently mistreating, injuring, killing without lawful justification[,] or tormenting an animal; or (2) abandoning or failing to provide necessary sustenance to an animal under that person's custody or control." Defendant argues that the statutory language failed to provide her notice that her conduct was prohibited and is overbroad thereby allowing for subjective, ad hoc application of this subsection. Specifically, Defendant contends that under Section 30-18-1(B), she would not comprehend that her failure to provide adequate shelter and medical care to her dogs constitutes a failure to provide "necessary sustenance" under the statute. In so arguing, Defendant assumes that her convictions for animal cruelty are based on a finding that she failed to provide necessary sustenance to her dogs. However, the record does not support this assumption. Defendant fails to consider the alternative theories of animal cruelty enumerated by the subsection. The elements of Section 30-18-1(B) were set forth in the jury

instructions. The jury was instructed:

> For you to find [Defendant] guilty of cruelty to animals, as charged in [Counts 4, 8, 9, 14, 15, 16, 18, 21, and 22], the [S]tate must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
>
> 1.     [D]efendant negligently mistreated, injured, or tormented an animal [or] abandoned or failed to provide necessary sustenance to an animal under her custody or control;
>
> 2.     This happened in New Mexico on or about the 15th day of September, 2008.

The jury returned general verdicts of guilty of cruelty to animals but did not indicate which theory the jury relied upon in convicting Defendant. Accordingly, we cannot say that Section 30-18-1(B) was applied to Defendant's conduct in the way that she suggests. Nor does Defendant provide us with any evidence to show that the jury in fact relied solely on the element of sustenance. "It is not our practice to rely on assertions of counsel unaccompanied by support in the record. The mere assertions and arguments of counsel are not evidence." *Chan v. Montoya*, 2011-NMCA-072, ¶ 9, 150 N.M. 44, 256 P.3d 987 (internal quotation marks and citation omitted). For this Court to rule on an inadequately briefed constitutional issue would essentially require it to do the work on behalf of Defendant. *See State v. Clifford*, 1994-NMSC-048, ¶ 19, 117 N.M. 508, 873 P.2d 254 (reminding counsel that the appellate courts are not required to do their research). A general verdict does not identify which theory the jury relied upon in returning the guilty verdict. "[W]here alternative theories of guilt are put forth under a single charge, jury unanimity is required only as to the verdict, not to any particular theory of guilt." *State v. Godoy*, 2012-NMCA-084, ¶ 6, 284 P.3d 410. New Mexico's uniform jury instructions "either refer generally to a requirement of jury unanimity or require only that the jury agree on a verdict. No provision explicitly or implicitly requires jury unanimity on an underlying theory." *Id.* (alteration, internal quotation marks, and citation omitted); *see State v. Salazar*, 1997-NMSC-044, ¶ 32, 123 N.M. 778, 945 P.2d 996 (stating that the Supreme Court has held that "a jury's general verdict will not be disturbed in such a case where substantial evidence exists in the record supporting at least one of the theories of the crime presented to the jury"); *Bustos v. Hyundai Motor Co.*, 2010-NMCA-090, ¶ 48, 149 N.M. 1, 243 P.3d 440 ("A general verdict may be affirmed under any theory supported by evidence unless an erroneous jury instruction was given.").

a.     **Sufficient Evidence Supports Convictions for Animal Cruelty**

**{16}**     Defendant claims that the State presented insufficient evidence to support her ten convictions for cruelty to animals, contrary to Section 30-18-1(B). "When reviewing a challenge to the sufficiency of the evidence, we must determine whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a

5

reasonable doubt with respect to every element essential to a conviction." *State v. Cordova*, 2016-NMCA-019, ¶ 16, 366 P.3d 270 (internal quotation marks and citation omitted), *cert. granted*, 2015-NMCERT-008, ___ P.3d ___. "Substantial evidence is evidence acceptable to a reasonable mind as adequate to support a conclusion." *State v. Arrendondo*, 2012-NMSC-013, ¶ 10, 278 P.3d 517. The appellate courts "must view the evidence in the light most favorable to the [s]tate, resolving all conflicts and indulging all permissible inferences in favor of the verdict." *State v. Reed*, 2005-NMSC-031, ¶ 14, 138 N.M. 365, 120 P.3d 447.

**{17}** As noted earlier, in order to convict Defendant of cruelty to animals as charged in Counts 4, 6, 7, 12, 13, 14, 16, 19, 20, and 21, the State was required to show beyond a reasonable doubt that Defendant "negligently mistreated, injured[,] or tormented an animal [or] abandoned or failed to provide necessary sustenance to an animal under her custody or control." The jury was also instructed on general criminal intent: "In addition to the other elements of . . . cruelty to animals . . . the [S]tate must prove to your satisfaction, beyond a reasonable doubt[,] that [D]efendant acted intentionally when she committed the crime."

**{18}** Based on our review of the record, it does not appear that the jury was instructed on the definition of "criminal negligence." Nonetheless, the jury instructions are the law of the case against which the sufficiency of the evidence supporting the jury's verdict is to be measured. *See State v. Smith*, 1986-NMCA-089, ¶ 7, 104 N.M. 729, 726 P.2d 883 ("Jury instructions become the law of the case against which the sufficiency of the evidence is to be measured."). Accordingly, we review the evidence to determine whether sufficient evidence was presented to support, beyond a reasonable doubt, that Defendant intentionally "mistreated, injured, or tormented" or "abandoned or failed to provide necessary sustenance to" Two-Pac, Prince, Precious, Samson, Kangadoo, Mamba, Patches, Moe, Curley, and Roxie. *See* § 30-18-1(B).

**Two-Pac—Count 4**

**{19}** We conclude that there was sufficient evidence in the record to support Defendant's conviction on Count 4 relating to Two-Pac. Photographs taken at the time of the search show that Two-Pac was chained outside. He was emaciated to the degree that his ribs and his hip bones were visibly protruding. He had old injuries on his face and open sores on his head and ear, and his skin was in poor condition. He also had an eye condition that caused his eyelid to roll inward.

**Prince—Count 6**

**{20}** In reviewing Defendant's sufficiency challenge, we conclude that there was sufficient evidence in the record to support Defendant's conviction on Count 6 relating to Prince. Photographs taken at the time of the search show that Prince was chained outside. His water bucket was lined with green algae. He was infested with ticks, his skin condition was poor, and he had hair loss on his face and back end. His ears were clipped, and he had scarring on his face. He also had a harsh cough. Prince appeared to be at a normal weight, however, the

6

girth of his body was not muscle or fat but accumulated fluid. Dr. Norris testified that this type of fluid accumulation is typically caused by heart failure associated with heart worm disease or liver problems. On September 25, 2008, Prince tested positive for heart worm disease at the animal shelter.

**Precious—Count 7**

**{21}** We conclude that there was sufficient evidence to support Defendant's conviction on Count 7 relating to Precious, based on our review of the evidence. Photographs taken at the time of the search show that Precious was chained outside with no water. She was very thin and her ribs and pelvic bones were visible. Her skin condition was poor, and she had healing puncture wounds and scarring on her face, which were consistent with staged dogfighting.

**{22}** Precious had a large open sore behind her ear. When Precious was discovered, flies were present on and around the sore. Dr. Norris testified that flies are often attracted to open wounds and will feed off of the tissue causing the injury to worsen and expand. The presence of the flies also irritates and aggravates the area, causing the dog to rub and scratch at it, which also worsens the wound. According to Dr. Norris, this type of open sore is very painful.

**Samson—Count 12**

**{23}** We conclude that there was sufficient evidence in the record to support Defendant's conviction on Count 12 relating to Samson. Photographs taken at the time of the search show that Samson was chained outside without water. There was a piece of plyboard propped up on some logs, which provided some shade for him. There was also a rusted-out barrel that he may have used for shelter.Samson was underweight and had scars from old injuries on his ears and back end.

**Kangadoo—Count 13**

**{24}** Based on our review of the evidence, we conclude that there was sufficient evidence to support Defendant's conviction on Count 13 relating to Kangadoo. Photographs taken at the time of the search show that Kangadoo was chained outside. Her water bucket was filled with muddy water and algae. There was an empty barrel with a hole in the bottom that she may have used for shelter. Kangadoo was underweight, she had hair loss on her back end, and her skin was in poor condition. She had old injuries and an open cut on her face. She had a large open sore on her ear.

**{25}** Kangadoo had a small tumor on her inner thigh, a small mass on her lower abdomen, and a large vaginal tumor that distorted her anatomy and made it difficult for her to urinate. Kangadoo was diagnosed with both heart worm disease and cancer. She was euthanized at the animal shelter on September 26, 2008.

7

**Mamba—Count 14**

{26}     In reviewing Defendant's sufficiency argument, we conclude that there was sufficient evidence in the record to support Defendant's conviction on Count 14 relating to Mamba. Photographs taken at the time of the search show that Mamba was chained outside. Her water bucket was tipped over and she had no shelter. She was infested with ticks, and her eye was oozing with pus. She was extremely thin and had scarring on her head, back, and back end. Her ears had sores from being bitten by flies. She also had open sores on her legs and a blood blister on her mammary teat. Mamba's K-9 teeth, incisors, and molars were filed down. She was euthanized at the animal shelter on September 16, 2008.

**Patches—Count 16**

{27}     Based on our review of the evidence, we conclude that there was sufficient evidence to support Defendant's conviction on Count 16 relating to Patches. Photographs taken at the time of the search show that Patches was chained outside. His area was overgrown with weeds, and he did not have any water. Patches was missing hair all around his neck, on the insides of his legs, and on his hindquarters. He had dermatitis on his legs, his collar had chunks of dirt and hair, and a scar around his neck appeared to be from an embedded collar. Patches had a large open sore behind his ear and fly bites on top of his ears. Patches also suffered from an umbilical hernia and had pustules on his scrotum. He was euthanized the same day he was removed from Defendant's property.

**Moe—Count 19**

{28}     We also conclude that there was sufficient evidence in the record to support Defendant's conviction on Count 19 relating to Moe. Photographs taken at the time of the search show that Moe was chained outside without water. He showed "major neurological signs"; he was star gazing, or swinging his head back and forth, snapping at the air, shaking, and having trouble getting oriented to his surroundings. His mouth was bleeding, and he had fluid filled nodules on his elbows and hind legs. Moe was very aggressive and was euthanized the same day he was removed from Defendant's property.

**Curly—Count 20**

{29}     Based upon our review of the evidence, we conclude that there was sufficient evidence to support Defendant's conviction on Count 20 relating to Curly. Photographs taken at the time of the search show that Curly was chained outside without water. He was very thin, his ribs and hip bones protruded, he had pus-like drainage from his nose, and his ear was torn. He had open sores on his head, back, and shoulders, and fluid-filled nodules on his elbows and hind legs. Curly was also very aggressive and was euthanized the same day he was removed from Defendant's property.

**Roxie—Count 21**

**{30}** After a review of the evidence, we conclude that there was sufficient evidence to support Defendant's conviction on Count 21 relating to Roxie. Photographs taken at the time of the search show that Roxie was found in a crate inside Defendant's residence. The crate was caked in some sort of brown substance inside and out. Trash was piled up all around and on top of the crate. Inside the crate, the place where Roxie was lying was also covered in trash, including old newspapers and empty soda cans. She did not appear to have access to water. Roxie was underweight, she had hair loss on her back leg, and she also had fleas. Roxie had swollen puncture wounds on her face and foot. There were teeth marks on her leg, and the underside of her neck was scraped and bruised. The puncture wounds under her legs, on her neck, and back appeared to be healing, indicating she had sustained multiple injuries on separate occasions. All of Roxie's injuries were consistent with staged dogfighting. Accordingly, we further conclude that there is sufficient evidence in the record to support any of the theories set forth in the jury instruction on cruelty to animals.

## 2.      Section 30-18-1(E)—Extreme Cruelty to Animals

**{31}** Defendant argues that her charges for extreme cruelty to animals for failure to treat an animal's terminal illness are void for vagueness. Specifically, Defendant claims that a person of ordinary intelligence would not equate torture or mutilation with not treating a seriously ill dog. Section 30-18-1(E) defines "extreme cruelty to animals" as consisting "of a person (1) intentionally or maliciously torturing, mutilating, injuring[,] or poisoning an animal; or (2) maliciously killing an animal." Defendant also argues that her behavior did not fall within the conduct the Legislature intended to punish as extreme cruelty to animals under the subsection.

**{32}** At trial, one of the State's theories of the case was that Defendant intentionally tortured, mutilated, or injured the dogs in her care, custody, and control. Defendant argues that under Section 32-18-1(E), the failure to seek or provide veterinary care to these seriously ill or injured dogs does not constitute torture as contemplated by this subsection. In so arguing, Defendant assumes that her convictions for extreme cruelty to animals are based on a finding that she tortured her dogs. However, the record does not support this assumption. Again, Defendant fails to consider the alternative theories of extreme cruelty to animals enumerated by this subsection. The elements of Section 30-18-1(E) were set forth in the jury instructions. The jury was instructed as follows:

> For you to find [Defendant] guilty of extreme cruelty to animals, as charge[d] in [Counts 3, 5, 8, 10, 11, 15, 17, and 18], the [S]tate must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
>
> 1.      [D]efendant intentionally or maliciously tortured, mutilated or injured an animal;
>
> 2.      This happened in New Mexico on or about the 15th day of

9

September, 2008.

**{33}** The jury returned general verdicts of guilty of extreme cruelty to animals but did not indicate which theory it relied upon in convicting Defendant. Accordingly, we cannot say how Section 30-18-1(E) was applied by the jury to Defendant's conduct. The general verdict did not identify which theory the jury relied upon, nor did it require unanimity on an underlying theory in returning the guilty verdict, only that there be unanimity as to the verdict. *See Godoy*, 2012-NMCA-084, ¶ 6. The general verdict will not be disturbed if there is substantial evidence in the record to support at least one of the theories of the crime presented to the jury. *See Salazar*, 1997-NMSC-044, ¶ 32; *Bustos*, 2010-NMCA-090, ¶ 48 ("A general verdict may be affirmed under any theory supported by evidence unless an erroneous jury instruction was given.").

**{34}** Defendant does not direct us to any evidence to show that the jury in fact relied solely on the element of torture. Again, appellate courts simply cannot rely on the assertions of counsel without support in the record. *Chan*, 2011-NMCA-072, ¶ 9. For this Court to rule on an inadequately briefed constitutional issue would essentially require us to do the work on behalf of Defendant, which we will not do. *See Clifford*, 1994-NMSC-048, ¶ 19 (reminding counsel that the appellate courts are not required to do their research).

a. **Defendant's Behavior Falls Within the Confines of Section 30-18-1(E) and Sufficient Evidence Supports Defendant's Convictions for Extreme Cruelty to Animals**

**{35}** Defendant argues, within the confines of torture, that her inactions do not fall within Section 30-18-1(E). She also claims that the State presented insufficient evidence to support her eight convictions for extreme cruelty to animals, contrary to the subsection. The overlapping analysis of whether Defendant's conduct falls within the confines of this subsection and whether there was sufficient evidence to support Defendant's convictions for extreme cruelty to animals necessitates the discussion of these issues together. Defendant was convicted of eight counts of extreme cruelty to animals concerning the following dogs: Jade, Jack, Deuce, Desiree, Itty-Bitty, Cleo, Hannibal, and Bobby. Of the eight dogs that Defendant was convicted of subjecting to extreme cruelty, all eight were without clean water; seven were underweight; one was emaciated; five were severely emaciated; six had obvious scarring consistent with staged dogfighting; six had open wounds and untreated sores; one had a severe eye injury; two had advanced heart worm disease; one was infested with ticks; three had large painful tumors or masses; two exhibited obvious signs of serious illness; and four had teeth that were cut or filed to the gum line, making it extremely painful to eat or drink.

1. **Itty-Bitty (Count 3), Cleo (Count 8), Hannibal (Count 10), and Bobby (Count 17)**

**Itty-Bitty—Count 3**

**{36}** Based on the evidence in the record, we conclude that Defendant's conduct is punishable under Section 30-18-1(E), and there was sufficient evidence to convict Defendant of extreme cruelty relative to Itty-Bitty. Photographs taken at the time of the search show that Itty-Bitty was found in a bedroom inside Defendant's residence, lying in urine and feces. She was crying out and thrashing her front paws. Itty-Bitty was completely emaciated and was unable to get up. Her breathing was labored, and she was unable to close her mouth. Itty-Bitty's condition was so grave that she was immediately taken to the animal shelter and had to be euthanized that night. Her body was taken to the New Mexico State Diagnostic Lab, where Dr. Norbert Takacs, a veterinary pathologist, performed a necropsy.

**{37}** Records from the animal shelter note that Itty-Bitty had scars all over her face and front legs. Several of her teeth were missing or broken off. She had multiple chronic pressure ulcers on her skin. The necropsy report indicates that Itty-Bitty suffered from advanced pneumonia. However, the most serious conditions underlying Itty-Bitty's death were extreme emaciation and severe heart worm disease. With regard to Itty-Bitty's body, Dr. Takacs described her emaciated condition as "the skin is kind of drying on [the] bone or skeleton." Dr. Takacs also described Itty-Bitty's heart worm disease as "very severe." Heart worm disease is a parasitic infection typically spread by mosquitos. The heart worm parasites affect the heart and the pulmonary arteries causing heart failure if left untreated.

**{38}** Dr. Norris testified that heart worm disease in its early stages may be treatable; however, if the disease is allowed to progress to heart failure, treatment is no longer effective to save the dog's life. Dr. Norris also testified to the various heart worm preventions, such as minimizing mosquito populations by clearing away excess brush, eliminating standing water, keeping water fresh and changed out, applying insect repellant to animals housed outdoors, and giving dogs preventive medication. Dr. Norris also recommended testing dogs for heart worm and treating any in the early stages of the disease so that mosquitos do not spread the disease from dog to dog. In Itty-Bitty's case the disease was so advanced, her heart and associated arteries were full of heart worms that were approximately seven to eight inches long.[1]

**Cleo—Count 8**

**{39}** Based on the evidence in the record, we conclude that Defendant's conduct is punishable under Section 30-18-1(E), and that there was sufficient evidence to support Defendant's conviction on Count 8 relating to Cleo. Photographs taken at the time of the search show that Cleo was kept outside in a small fenced area. Her make-shift shelter had

---

[1]Dr. Takac's testimony was that the heart worms were 18 to 22 centimeters long. For the purposes of this opinion centimeters were converted to inches for a more common frame of reference. *See* Metric Conversions, http://www.metric-conversions.org/length/centimeters-to-inches-table.htm (last visited May 10, 2016).

11

collapsed and was nearly covered by the tall weeds. Her water bucket was dirty and nearly covered with the overgrowth. She had sores around her ear, her skin condition was poor, and she was infested with ticks and fleas. Cleo also had a large mammary tumor approximately the size of a grapefruit. The tumor was very painful to Cleo upon examination and was so advanced that it was not treatable. Cleo was euthanized at the animal shelter on September 26, 2008.

**Hannibal—Count 10**

{40}    Hannibal was chained outside among a large overgrowth of weeds without water or shelter. He had injuries to his head, face, ears, and legs. He also had a skin condition called seborrhea, which caused his skin to be irritated and crusted over. Hannibal had hair loss on his back end and was severely emaciated, his hip bones were sticking out, and his ribs were very prominent. Dr. Norris testified that the muscle tissue around Hannibal's rib cage was so atrophied that she could put her fingers between his ribs.

{41}    Despite his emaciated condition, Hannibal's abdomen was large and filled with fluid. According to Dr. Norris, the tremendous amount of fluid accumulated in Hannibal's abdomen "was actually stretching his muscles out about as far as they could go." Fluid was also accumulating in Hannibal's lungs, making it very difficult for him to breathe. Hannibal had trouble walking because he would be out of breath. He could not get comfortable, and he would not sit down because doing so made breathing even more difficult for him. During her examination, Dr. Norris took care not to move him or have him walk because he was having a great deal of difficulty breathing just standing there; he was in distress. Hannibal also had a tumor on his underside that was bleeding and oozing.

{42}    Dr. Norris testified that a pet owner would easily be able to recognize that a dog in Hannibal's condition was in severe distress; there was no doubt that he was suffering. Given the severity of the condition that Hannibal was allowed to progress, treatment options were limited; Dr Norris' recommendation was euthanasia. Hannibal was euthanized at the animal shelter on September 26, 2008.

**Bobby—Count 17**

{43}    Bobby was chained outside without any water. Bobby's skin condition was poor. He had old injuries on his face and legs, and open sores on his head and his shoulders. Bobby's eye was injured and infected, and it was nearly swollen shut and oozing with pus. Bobby had an umbilical hernia. He was severely emaciated, with no palpable fat, obvious loss of muscle mass, and his ilium and scapula bones were protruding. Bobby was euthanized the same day he was removed from Defendant's property.

**2.        Jade (Count 5), Jack (Count 11), Deuce (Count 15), and Desiree (Count 18)**

**Jade—Count 5**

12

**{44}** Based on the evidence in the record, we conclude that there was sufficient evidence to support Defendant's conviction on Count 5 relating to Jade. Photographs taken at the time of the search show that Jade was chained outside with no water. Her only shade or shelter was a piece of plywood propped up against two fence posts. She was infested with ticks, she was emaciated, and her ribs and hip bones visibly protruded. She had old injuries on her ear. Her skin condition was poor, she had hair loss on her back end, and she had a tumor on her neck. Jade's uterus was enlarged and firm, indicating that she was pregnant. Her teeth had been cut or filed down.

**{45}** Dr. Norris testified that blunting dogs' teeth is a practice used in some dogfighting rings. She explained that older dogs, or dogs who may no longer be able to fight competitively are sometimes used as "trainer dogs" in practice against younger inexperienced fighting dogs. The trainers' teeth are blunted to minimize damage to the trainee dogs. When a dog's teeth are filed or cut it is very painful for the dog, especially if the root cavity or canal is exposed. The dogs are reluctant to eat or drink because biting down and taking water with the root exposed is excruciating. Exposing the root in that way also exposes the dog to infection of the bone. In Jade's case, her teeth were filed all the way down to the gum line, and the roots were completely exposed. She was in an incredible amount of pain and would not let Dr. Norris touch her mouth long enough to photograph her teeth.

**Jack—Count 11**

**{46}** Based on the evidence in the record, we conclude that there was sufficient evidence to support Defendant's conviction on Count 11 relating to Jack. Photographs taken at the time of the search show that Jack was chained outside. His water bucket was filled with muddy water and algae. Jack was thin; his ribs and hip bones were visible. Jack had old injuries on his face and hair loss in patches throughout his entire body. Jack had superficial wounds on the top of his head that were consistent with scrapes or fly bites or "fly strike." Jack had similar wounds behind his ear and on his side.

**{47}** There were deeper wounds over his entire muzzle that could have been consistent with staged dogfighting. However, Dr. Norris testified that the wounds on Jack's muzzle, along with some scabbing on his legs, were likely solar dermatitis, an infection in the skin caused by allergies, or by sensitivity and exposure to the sun. According to Dr. Norris, solar dermatitis is very painful for a dog because the wounds on the muzzle are raw and oozing, and if the dog is not protected from the sun, and the wounds are not treated, the same skin is injured by the sun repeatedly. Jack's canine teeth and incisors were cut or filed down, and the roots of the canine teeth were exposed. Jack died in the animal shelter as a result of severe heart worm disease and related complications.

**Deuce—Count 15**

**{48}** Based on the evidence in the record, we conclude that there was sufficient evidence

to support Defendant's conviction on Count 15 relating to Deuce. Photographs taken at the time of the search show that Deuce was chained outside. There was a piece of plyboard propped up on some cinder blocks that provided some shade and shelter. He did not have any water. His skin condition was poor, and he had old injuries and scars on his face, ears, and legs. Deuce also had a puncture wound on his face, a healing laceration on his leg, and an open wound on his ear. He was severely emaciated. He had extreme muscle wasting over his entire body. His backbone appeared to be raised because all of the muscles connecting his ribs to his backbone were gone. His hip bones stuck out tremendously, and the muscle on his head was significantly wasted. Deuce's teeth had all been cut or filed down to the gum line. The roots and nerves were exposed, which Dr. Norris testified, would have been extremely painful. Deuce was euthanized the same day he was removed from Defendant's property.

**Desiree—Count 18**

{49}    Based on the evidence in the record, we conclude that there was sufficient evidence to support Defendant's conviction on Count 18 relating to Desiree. Photographs taken at the time of the search show that Desiree was chained outside without water. Her chain was tangled to her post so that she could not move around. Her skin condition was poor and she had sores on her face, ears, legs, and back end. Desiree was very emaciated; her backbone and ribs protruded. Dr. Norris testified that she could put her fingers between Desiree's ribs. Desiree's teeth were filed down with the pulp exposed. In the shelter, Desiree was able to eat but was exhibiting multiple symptoms of illness including diarrhea, nasal discharge, and a cough. Desiree tested positive for heart worm disease and was euthanized approximately one month after being removed from Defendant's property in 2008. Accordingly, we also conclude that there is sufficient evidence in the record to support any of the theories set forth in the jury instruction on extreme cruelty to animals.

## III.    CONCLUSION

{50}    For the foregoing reasons, we uphold the constitutionality of the animal cruelty statute and affirm Defendant's convictions for cruelty to animals and extreme cruelty to animals.

{51}    **IT IS SO ORDERED.**

_____
 **M. MONICA ZAMORA, Judge**

**WE CONCUR:**

_____
**JONATHAN B. SUTIN, Judge**

14

_____
**LINDA M. VANZI, Judge**